# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Pister v. Matrix Service Industrial Contractors, Inc.*, 2013 IL App (4th) 120781

---

| | |
|---|---|
| Appellate Court Caption | TISHA PISTER, as Independent Administrator of the Estate of Jeffrey Pister, Deceased, Plaintiff-Appellant, v. MATRIX SERVICE INDUSTRIAL CONTRACTORS, INC., a Foreign Corporation, Defendant-Appellee. |
| District & No. | Fourth District<br>Docket No. 4-12-0781 |
| Filed | September 6, 2013 |
| Rehearing denied | October 10, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from a collision in which the vehicle driven by plaintiff's decedent was struck by a vehicle driven by defendant's employee, the trial court's entry of partial summary judgment for defendant was affirmed, notwithstanding plaintiff's contention that the trial court erred in prohibiting her from asserting the "traveling employee" theory of *respondeat superior* to the jury, since the appellate court declined to extend the Workers' Compensation Act's "traveling employee" principle to a *respondeat superior* case. |
| Decision Under Review | Appeal from the Circuit Court of Champaign County, No. 09-L-190; Michael Q. Jones, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Michael T. Reagan, of Law Office of Michael T. Reagan, of Ottawa, David V. Dorris and Amelia Buragas (argued), both of Dorris Law Firm, P.C., of Bloomington, and Ray Moss (argued), of Moss & Moss, P.C., of Clinton, for appellant. |
|---|---|
| | Melinda S. Kollross (argued), Paul V. Esposito, Kimberly A. Hartman, and Mark J. Sobczak, all of Clausen Miller P.C., and John W. Patton, Jr., and C. Zachary Vaughn (argued), both of Patton & Ryan LLC, both of Chicago, for appellee. |
| Panel | JUSTICE HOLDER WHITE delivered the judgment of the court, with opinion. Presiding Justice Steigmann concurred in the judgment and opinion. Justice Appleton specially concurred, with opinion. |

# OPINION

¶ 1 In April 2009, a vehicle driven by Brian Stultz (Brian) struck the vehicle of Jeffrey Pister, resulting in the death of both men. At the time of the accident, Brian was nearing his destination in Champaign, Illinois, where he was scheduled to work later that morning for defendant Matrix Service Industrial Contractors, Inc., a foreign corporation (Matrix).

¶ 2 In May 2011, Jeffrey's widow, plaintiff Tisha Pister, as independent administrator for the estate of Jeffrey Pister (hereinafter Pister), filed a third amended complaint against Matrix and the estate of Brian Stultz (Estate). The Estate is not a party on appeal. As part of the complaint, Pister claimed Matrix was liable for Pister's death under the doctrine of *respondeat superior*. Pister set forth two theories of liability, asserting (1) Brian was a "traveling employee" of Matrix, on which the court, pretrial, granted summary judgment for Matrix and (2) Brian was on a "special errand" for Matrix at the time of the accident. The jury returned a verdict in favor of Matrix on Pister's "special errand" theory.

¶ 3 Pister appeals, arguing the trial court committed reversible error by (1) granting partial summary judgment in favor of Matrix, (2) admitting or excluding certain evidence, and (3) giving erroneous instructions to the jury. We affirm.

¶ 4 I. BACKGROUND

¶ 5 In the early morning hours of April 13, 2009, a vehicle driven by Brian crossed the centerline and struck an oncoming vehicle driven by Jeffrey Pister. The accident proved fatal for both men. An autopsy revealed Brian had oxycodone in his system. At the time of the

accident, Brian was driving from Ohio toward a construction site in Champaign, Illinois, in order to start a job for which he was hired by Matrix.

¶ 6                                A. The Complaint

¶ 7        In September 2009, Pister filed a complaint against defendants Matrix and the Estate. As the case unfolded, Pister filed a third amended complaint in May 2011. The complaint alleged several counts, asserting (1) negligence and wrongful death liability against the Estate, (2) negligence and survival action liability against the Estate, (3) *respondeat superior* and wrongful death liability against Matrix, (4) *respondeat superior* and survival action liability against Matrix, (5) negligence and wrongful death liability against Matrix, and (6) negligence and survival action liability against Matrix. Prior to trial, Pister voluntarily dismissed the Estate from the case.

¶ 8                            B. Motion for Summary Judgment

¶ 9        In April 2011, Matrix filed a motion for summary judgment, asserting Brian was not an employee of Matrix at the time of the accident because he had not yet arrived at the jobsite. Pister filed a response, arguing Brian was within the scope of his employment, both as a "traveling employee" and because he was on a "special errand" for Matrix to deliver equipment to the jobsite. After a May 2011 hearing, the trial court determined it would not allow Pister to present the "traveling employee" theory of liability to the jury, finding the theory was restricted only to workers' compensation cases. Conversely, the court found a material issue of fact existed for the "special errand" theory of liability, which required presentation to the jury. The court then ordered a docket entry contradictory to its findings, denying in total Matrix's motion for summary judgment.

¶ 10                             C. Pretrial Conference

¶ 11       At a February 2012 pretrial conference, the trial court (1) asserted it previously granted partial summary judgment to Matrix during the May 2011 hearing with regard to the "traveling employee" theory of liability, (2) granted Matrix's motion to prohibit Pister from arguing Matrix was liable for Brian driving under the influence of a drug but then extended the ruling to prohibit all mention of Brian's drug use, and (3) allowed evidence that the Estate was once a party to the case.

¶ 12       With respect to the trial court's statement regarding the motion for summary judgment, the court explained its prior ruling granted the motion as to the "traveling employee" theory of liability, which restricted the trial to the "special errand" theory of liability. Neither party attempted to clarify or correct the trial court's remarks; in fact, Pister's attorney said he was "acutely aware" of the court's ruling with regard to that issue.

¶ 13       In prohibiting the parties from mentioning Brian's legal prescription drug use, the court stated:

> "I don't think oxycodone has anything to do with this. It is introducing elements to this trial that we need to avoid, especially in light of the fact and under my assumption that

the liability is not contested here for this accident. \*\*\* What matters is is [*sic*] that Mr. Pister was the victim of someone else's failure to observe his duty to drive with due regard for other motorists, so that's my ruling."

The court's finding required the parties to edit portions of recorded evidentiary depositions in order to remove all mention of Brian's legal drug use as well as the exclusion of letters sent by the Stultzes to Brian's insurance company demanding payment on the claim.

¶ 14     Additionally, the court ruled Matrix could tell the jury the Estate was previously a party in this matter, allowing Matrix to argue members of the Stultz family, as beneficiaries to the Estate, had a bias or motive to lie about Brian's scope of employment.

¶ 15                                              D. Jury Trial

¶ 16     The case proceeded to trial in February 2012. The central factual issue for the jury to determine was whether Brian was in the scope of his employment with Matrix at the time of the accident, as demonstrated by Brian transporting welding rods and other equipment in his vehicle.

¶ 17     During opening arguments, the court read to the jury Illinois Pattern Jury Instructions, Civil, No. 2.03 (2006) (hereinafter, IPI Civil (2006) No. 2.03), which explained to the jury the Estate had previously been a party to the case, but the jury was not to speculate why the Estate was no longer a party.

¶ 18     Pister presented several witnesses to prove a Matrix employee asked Brian to transport welding rods and other equipment to the Champaign, Illinois, jobsite for use at either the Champaign job or a subsequent job. Josie and Robert Stultz, the parents of Brian, testified via a redacted evidentiary deposition recording that Brian told them he was transporting equipment to Champaign at the request of Matrix. On April 12, 2009, which was Easter Sunday, the Stultz family gathered for Easter dinner at the home of a relative. Josie testified, during that visit, she observed Brian speaking with a Matrix employee, later identified as Larry Martin, the supervisor of equipment who oversaw the delivery of materials and equipment to jobsites, out near their parked vehicles. She saw Brian walk from Martin's vehicle back to his own, then return to Martin's vehicle, but she did not see what, if anything, he was carrying. Robert Stultz, who knew several Matrix employees, explained Matrix employees from the area, like Brian, commonly transported equipment to jobsites because they resided near Matrix's headquarters. Both Josie and Robert testified they would do anything for their granddaughter, Brian's daughter, but denied lying in order to gain additional financial recovery from Brian's insurance company, MetLife.

¶ 19     Pister also presented Carys Fitzgerald's testimony via recorded deposition. Fitzgerald was Brian's fiancée and the mother of his child. She testified, following Easter dinner with Brian's relatives, she and Brian returned home to discover a brown box of welding rods on the back porch. Brian placed the box in his vehicle. In her experience, Brian commonly transported Matrix equipment to jobsites. In his free time, Brian frequently welded with his mother, a welding instructor.

¶ 20     Brian Hensley, Brian's friend, relative, and former coworker, testified he saw Brian speaking with Larry Martin at Brian's relative's home on Easter. Hensley saw Brian with a

-4-

box of materials in his car but could not recall the specific items. As a former employee of Matrix, Hensley explained Matrix allowed its crew members to keep scrap metal to practice their respective crafts, such as welding. Brian indicated to Hensley he was not being paid to transport the welding rods on Matrix's behalf. Hensley also pointed out the welding rods collected from the accident scene would not have fit Brian's welding machine at home.

¶ 21    Anthony Matens, a personal investigator hired by Pister in the early stages of the case, testified he interviewed Josie Stultz, Robert Stultz, and Carys Fitzgerald. He said no one mentioned any conversations they had with Brian in which Brian said he was delivering welding rods on behalf of Matrix, nor did they mention the welding rods at all.

¶ 22    Matrix also presented evidence regarding whether Brian was on a "special errand" for Matrix at the time of the accident. The parties did not dispute the fact that the Champaign job required no welding and, thus, no welding rods. Upon arriving at the scene of the accident, Illinois State Trooper Ryan Fuoss, who specialized in accident reconstruction, noticed white boxes in Brian's vehicle; however, he could not testify as to the condition of those boxes before the accident or prior to his arrival at the scene, approximately one hour after the accident. Robert Stultz later recovered an angle iron and five unsealed, individual white boxes containing a variety of welding rods from Brian's car.

¶ 23    Larry Martin gave conflicting versions of events regarding Easter 2009. During one deposition, he could not recall meeting Brian on Easter. In another deposition, he remembered seeing Brian on Easter. Likewise, in one deposition, Martin explained he did not believe he gave welding rods to Brian on Easter for delivery. In another deposition, he agreed it was very possible he gave Brian welding rods on Easter for delivery. He did, however, consistently testify he never (1) visited the home of Brian's relative, (2) left a box of welding rods at Brian's house, or (3) delivered a box to Brian at the last minute (*i.e.*, the day before Brian was to leave for a job). He was also adamant he did not see Hensley on Easter. Martin agreed he had given Brian welding rods and other equipment in the past to transport to a jobsite, though he also agreed it was rare for employees to transport equipment, such as welding rods, to jobsites. Martin knew Brian to be a "scrapper," one who was often permitted to take leftover materials from the jobsite for personal use.

¶ 24    Martin then described the packaging of new boxes of welding rods that Matrix delivered to jobsites. First, he noted, the welding rods would have been in sealed boxes wrapped in cellophane to keep out moisture. Additionally, a box of welding rods scheduled for a jobsite would contain only one size of rods, whereas the boxes recovered from Brian's vehicle contained a variety of rod sizes.

¶ 25    Andrew Kissel, the foreman of Brian's crew, also testified about the required condition of welding rod boxes upon delivery to the jobsite. He explained welding rods were always delivered in a sealed crate, which was made up of four boxes of rods, all of the same size. Because Brian was carrying three types of rods in his vehicle at the time of the accident, in order to be consistent with Matrix's method of delivery, Brian would have needed to carry 12 boxes of welding rods. According to Kissel, Martin never had individual boxes of welding rods delivered to jobsites. Kissel described Brian as a "scrapper" with ongoing permission to take excess equipment, such as welding rods, for personal use. After examining the angle

iron found in Brian's car, Kissel immediately classified it as scrap metal for Brian's personal use because (1) his crew did not use angle irons and (2) that type of material would have been shipped directly from a supplier in Oklahoma.

¶ 26　　Moreover, as the foreman, Kissel testified he never asked Brian to deliver equipment to the jobsite, nor did he request Martin to have welding rods delivered because the equipment trailer did not need restocking. Whenever Kissel needed welding rods for other jobs, Martin always sent them through FedEx or another delivery service. Additionally, the Champaign job required no welding. Kissel thought a job had been scheduled following the Champaign job that would have required extensive welding, but Matrix's records did not reflect another job scheduled for that week.

¶ 27　　Members of the construction crew, who regularly worked with Brian and who were scheduled to work with him in Champaign, agreed the boxes of welding rods contained within Brian's car were consistent with personal use based on the variety of welding rods and the open packaging. They each explained Matrix had a policy allowing employees to use excess material to practice their crafts, such as welding, and that Brian received permission to take scrap metal for personal use. They knew Brian would practice welding at home. The crew described Brian as a "hoarder" or "packrat" who kept his garage full of scraps, including scrapped welding rods. Brian's friend and crew member, William Merwin, testified Brian carried welding rods in his car for personal use.

¶ 28　　Matrix project manager Eric Foster testified no welding rods or angle irons were needed at the Champaign job, nor was a job scheduled later in the week that would require those items. However, he could not say whether Matrix asked Brian to deliver the welding rods.

¶ 29　　Gregory Still, an operations manager for Matrix, testified he regularly provided scrap welding rods to Brian so Brian could practice his welding. In fact, he noted Brian's improvement in welding led to Brian being promoted from a regular crewman to a welder. Still explained he had no record of any jobs scheduled immediately following the Champaign job. The next job scheduled was in Georgia for the following week, which would have required only a small amount of welding. He also noted it was the regular practice of employees to work on the jobsite, return home on weekends, then leave late Sunday evenings or early Monday mornings to start the next assignment.

¶ 30　　　　　　　　　　　　　　　E. Jury Instructions

¶ 31　　Following the presentation of evidence, the parties tendered their recommended instructions to the court. As part of its instructions, Pister tendered Illinois Pattern Jury Instructions, Civil, No. 50.06 and a modified version of No. 50.06.01 (Supp. 2009) (hereinafter, IPI Civil (Supp. 2009) Nos. 50.06 and 50.06.01) regarding agency law. The court rejected those instructions and instead tendered only a non-IPI jury instruction defining the "special errand" theory of liability.

¶ 32　　While reading the instructions to the jury, the trial court made a *sua sponte* statement about the relationship between the special interrogatory and general verdict instructions. As the jury retired to deliberate, Pister brought the statement to the court's attention, but asked that no remedial instruction be given for fear it would draw too much attention to the error.

Over Pister's objection, the court tendered a remedial instruction.

## ¶ 33            F. Posttrial Motion

¶ 34      The jury returned with a verdict in favor of Matrix. In April 2012, Pister filed a posttrial motion, on which the trial court held a hearing in July 2012. The court determined it committed two errors during the trial: (1) making a *sua sponte* statement about the relationship between the general verdict and special interrogatory and (2) refusing Pister's IPI jury instructions regarding agency law. However, the court found the errors did not require a new trial because the evidence so overwhelmingly favored Matrix that Pister was not prejudiced by the errors. After a hearing, the court denied Pister's posttrial motion in its entirety. This appeal followed.

## ¶ 35            II. ANALYSIS

¶ 36      On appeal, Pister argues the trial court committed reversible error by (1) granting partial summary judgment in favor of Matrix, (2) admitting or excluding certain evidence, and (3) giving erroneous instructions to the jury. We address these assertions in turn.

## ¶ 37            A. Matrix's Motion for Summary Judgment

¶ 38      Pister first asserts the trial court erred in granting, in part, Matrix's motion for summary judgment. The court's ruling on a motion for summary judgment is subject to *de novo* review. *Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 163, 862 N.E.2d 985, 991 (2007). "Summary judgment is proper where the pleadings, affidavits, depositions, admissions, and exhibits on file, when viewed in the light most favorable to the nonmovant, reveal that there is no issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Abrams v. City of Chicago*, 211 Ill. 2d 251, 257, 811 N.E.2d 670, 674 (2004). When scope of employment is at issue, summary judgment is generally inappropriate. *Pyne v. Witmer*, 129 Ill. 2d 351, 359, 543 N.E.2d 1304, 1308 (1989). In these cases, summary judgment is appropriate only if no reasonable person could conclude from the evidence that an employee was acting within the scope of employment. *Pyne*, 129 Ill. 2d at 359, 543 N.E.2d at 1308. We first examine Pister's contention that the trial court ruled on the motion for summary judgment *sua sponte* and then determine whether the trial court erred by granting, in part, Matrix's motion for summary judgment.

## ¶ 39            1. *Whether the Court Made a Sua Sponte Ruling on*
*Defendant's Motion for Summary Judgment*

¶ 40      Pister asserts the trial court erred by reversing, *sua sponte*, part of its ruling on Matrix's motion for summary judgment, which the court had previously denied. Section 2-1005 of the Code of Civil Procedure (735 ILCS 5/2-1005 (West 2010)) "does not authorize the trial court to *sua sponte* summarily grant summary judgment." *Peterson v. Randhava*, 313 Ill. App. 3d 1, 11, 729 N.E.2d 75, 83 (2000). "By its very nature, a *sua sponte* ruling deprives a party of notice and an opportunity to raise objections because the court acts on its own and without

any warning." *Peterson*, 313 Ill. App. 3d at 13, 729 N.E.2d at 84.

¶ 41     Pister argues the trial court denied Matrix's motion for summary judgment on May 4, 2011, then changed its mind *sua sponte* on February 3, 2012, without notice to or further argument from the parties. We disagree. It appears the court made a mistake in creating its May 2011 docket entry, leading to a claimed misunderstanding on appeal but not a misunderstanding for the parties at trial. During the May 2011 hearing on Matrix's motion for summary judgment, the court noted, "I am way convinced from, among other reasons, the Chicago Bridge Iron case [(*Chicago Bridge & Iron, Inc. v. Industrial Comm'n*, 248 Ill. App. 3d 687, 618 N.E.2d 1143 (1993))] that [Brian] was a traveling employee as they discuss in that worker's compensation case." After hearing further argument from the parties, the court more specifically stated, "[w]ith regard to the concept of traveling employee, as I've suggested, I think there are no facts there that need to be resolved; rather, conclusions of law to be drawn from uncontested facts." The court then explained:

> "I don't know that I'm in a place to begin creating law here, and I don't think it[']s appropriate for me to decide. This is something for the Appellate Court to decide, whether or not they wish to create this traveling employee exception to the otherwise body of law that when you are traveling to the jobsite and leaving the jobsite to go home you are not acting within the scope of employment."

After determining an issue of material fact existed to prevent summary judgment with regard to Pister's contention that Brian was on a "special errand" for Matrix, the trial court ordered the clerk to make a docket entry denying the motion for summary judgment in its entirety.

¶ 42     In February 2012, three days before the trial was scheduled to begin, the parties submitted pretrial motions. At a hearing on the parties' motions, the trial court reiterated it had granted Matrix's motion for summary judgment with respect to the "traveling employee" theory of liability, leaving only the "special errand" theory of liability for the jury's determination. At that time, Pister did not object to or raise any concerns regarding this alleged *sua sponte* ruling. Rather, Pister's attorney acknowledged he was "acutely aware" of the trial court's prior ruling. It was not until Pister filed a posttrial motion in April 2012 that the trial court was made aware of what Pister claims was a *sua sponte* ruling on the motion for summary judgment, at which time the court stated:

> "I think it borders on the disingenuous to suggest that anybody was surprised on the day of trial that I had made this ruling. I made it clear multiple times that I believed that purely on the basis of those facts, that is that he [Brian] was traveling to Champaign to start work and didn't quite get there, that without anything else he wasn't in the scope of his employment."

¶ 43     Pister claims the court's *sua sponte* reversal of its own prior ruling deprived Pister of a fair trial. We disagree the court made a *sua sponte* ruling on the "traveling employee" theory of liability. Rather, the record reflects the parties clearly understood the trial court granted summary judgment in May 2011 with regard to the "traveling employee" theory even though the court mistakenly ordered the docket entry to reflect the motion for summary judgment had been denied. The court's February 2012 statements with respect to the "traveling employee" theory of liability were consistent with the court's May 2011 statements, which

-8-

were also consistent with the parties' understanding of the ruling. A mistake in the court's May 2011 order does not make the court's February 2012 statements a *sua sponte* ruling on Matrix's motion for summary judgment. Therefore, we conclude the court made no *sua sponte* ruling during the February 2012 pretrial hearing with regard to the "traveling employee" theory of liability.

¶ 44    2. *Whether the Trial Court Erred in Prohibiting Pister From Presenting*
*the "Traveling Employee" Theory of Liability to the Jury*

¶ 45    Pister next asserts the trial court erred in prohibiting Pister from asserting the "traveling employee" theory of *respondeat superior* to the jury. Having determined the court granted summary judgment with regard to this issue, we conduct a *de novo* review.

¶ 46    Ordinarily, an employer is not liable for an employee who is going to or coming from work. *Pyne*, 129 Ill. 2d at 356, 543 N.E.2d at 1307. An exception exists for the employee who is classified as a "traveling employee," defined as "one who is required to travel away from the employer's premises in order to perform his job." *Chicago Bridge & Iron, Inc.*, 248 Ill. App. 3d at 694, 618 N.E.2d at 1148. However, the parties acknowledge, in Illinois, this exception has only been applied in workers' compensation cases. Pister asks this court to extend the "traveling employee" theory to *respondeat superior* cases. We decline to do so.

¶ 47    After hearing arguments on Matrix's motion for summary judgment, the trial court determined Brian would have been classified as a "traveling employee" if his family filed a workers' compensation case in Illinois, relying on *Chicago Bridge & Iron, Inc.*, 248 Ill. App. 3d 688, 618 N.E.2d 1143, which held a construction employee traveling to various jobsites qualified as a "traveling employee" for purposes of the Workers' Compensation Act (Act) (Ill. Rev. Stat. 1985, ch. 48, ¶ 138.1 (now 820 ILCS 305/1 (West 2010))). However, the court correctly noted this classification has never been applied outside of workers' compensation cases and declined to extend the theory of liability to *respondeat superior* cases.

¶ 48    First, contrary to Pister's assertion, there is no genuine issue of material fact insofar as the "traveling employee" exception applies. The parties do not dispute Brian was driving to Champaign, Illinois, from his home in Ohio in order to work for Matrix. They do not dispute Brian was killed on his way to the jobsite. They do not dispute Brian crossed the centerline and, for unknown reasons, caused the accident that killed Jeffrey Pister. The only potential dispute is whether Brian qualified as an employee before he reached the jobsite. However, even construing the facts in the light most favorable to Pister, the nonmoving party, Pister cannot survive summary judgment. The central question was and is a legal question of whether the "traveling employee" exception would apply to a tort case. Therefore, it was incumbent upon the trial court to decide the case as a matter of law. Thus, our analysis turns on whether the court erred by determining the "traveling employee" theory did not apply to this case. To make our determination, we must decide whether principles of workers' compensation cases that allow for "traveling employees" to recover under the Act should apply to tort cases.

¶ 49    The purpose of the Workers' Compensation Act is to provide financial protection for employees who incur broadly defined work-related injuries. *Beelman Trucking v. Illinois*

-9-

*Workers' Compensation Comm'n*, 233 Ill. 2d 364, 371, 909 N.E.2d 818, 823 (2009). The procedures set forth therein allow an employee to achieve fair payment for a work-related injury without a determination of fault. *Equistar Chemicals, L.P. v. BMW Constructors, Inc.*, 353 Ill. App. 3d 593, 597, 817 N.E.2d 534, 538 (2004).

¶ 50 The same cannot be said for *respondeat superior* cases. *Respondeat superior* cases, unlike workers' compensation cases, assign liability to employers based upon an employee's negligence within the scope of employment. *Bagent v. Blessing Care Corp.*, 224 Ill. 2d at 163, 862 N.E.2d at 991. This provides a more limited inquiry than the "work-related injury" inquiry utilized in workers' compensation cases. Thus, to automatically extend the Act's "traveling employee" principle to tort liability would extend liability to an unlimited number of employers for the actions of their employees over which the employers may not have had direct control.

¶ 51 Pister relies on *Pyne*, 129 Ill. 2d at 359, 543 N.E.2d at 1308, to support the contention an employer can be held vicariously liable for torts committed by an employee within the scope of employment. As Matrix correctly notes, *Pyne* does not apply the "traveling employee" theory of liability; rather, the question raised in *Pyne* was whether the employee was on a "frolic" or "detour" from his employment at the time an accident occurred. *Pyne*, 129 Ill. 2d at 360-61, 543 N.E.2d at 1309. Pister centers her argument on the following language contained in *Pyne*: "Generally, an employee traveling to or from work outside actual working hours is not in the scope of employment, but an exception exists for employees who are caused by their employers to travel away from a regular workplace or whose travel is at least partly for their employers' purposes rather than simply serving to convey the employees to or from a regular jobsite." *Pyne*, 129 Ill. 2d at 356, 543 N.E.2d at 1307. However, we note the majority of cases cited within that statement are workers' compensation cases. The exception is *Hall v. DeFalco*, 178 Ill. App. 3d 408, 533 N.E.2d 448 (1988), which does not establish precedent for applying the "traveling employee" theory to a *respondeat superior* case. Instead, *Hall* focuses on an employer's action in supplying a vehicle or "supplying an employee with something in connection with going to or coming from work," which is demonstrative of the "special errand" theory of liability, not the "traveling employee" theory of liability. *Hall*, 178 Ill. App. 3d at 413, 533 N.E.2d at 452.

¶ 52 *Pyne*, similarly, does not establish the "traveling employee" theory of liability in *respondeat superior* cases. A closer reading of the facts reveals a situation more analogous to the "special errand" theory that the trial court allowed Pister to present to the jury. In *Pyne*, an employee was directed to take an evening exam to secure his certification as an automobile mechanic. *Pyne*, 129 Ill. 2d at 355, 543 N.E.2d at 1306. More than two hours after the exam ended, the employee, by then intoxicated, got into a vehicle collision with another individual. *Pyne*, 129 Ill. 2d at 356-57, 543 N.E.2d at 1307. As Matrix notes, one of the central issues was whether the employee engaged in a "frolic" or "detour" from employment at the time of the accident. *Pyne*, 129 Ill. 2d at 360-61, 543 N.E.2d at 1309. Because a question of material fact existed as to whether the employee had reentered the scope of employment from his "frolic" or "detour," the Illinois Supreme Court held summary judgment was inappropriate. *Pyne*, 129 Ill. 2d at 370, 543 N.E.2d at 1313. The case at bar is factually distinguishable from *Pyne* and relies on a different theory of liability.

¶ 53    Pister sets forth no other cases in support of her contention that we should apply the Act's "traveling employee" principle to *respondeat superior* cases. Likewise, Matrix sets forth no cases specifically refusing the "traveling employee" theory. We decline to extend the Act's "traveling employee" principle to *respondeat superior* cases because, as previously noted, the purposes of the Act and principles behind *respondeat superior* liability differ. Therefore, the trial court did not err in granting summary judgment to Matrix.

¶ 54                    B. Whether the Trial Court Abused Its Discretion
                            in Admitting Certain Evidence

¶ 55    Pister next argues the trial court erred by admitting or excluding certain evidence. The trial court's rulings with regard to the admission of evidence will not be overturned absent an abuse of discretion. *Jackson v. Seib*, 372 Ill. App. 3d 1061, 1070, 866 N.E.2d 663, 673 (2007). The court abuses its discretion when its rulings are "arbitrary, fanciful or unreasonable, or where no reasonable person would take the view adopted by the court." *Auten v. Franklin*, 404 Ill. App. 3d 1130, 1151, 942 N.E.2d 500, 518 (2010). The court may limit or exclude relevant evidence if "its probative value is substantially outweighed by such factors as prejudice, confusion, or potential to mislead the jury." *Gill v. Foster*, 157 Ill. 2d 304, 313, 626 N.E.2d 190, 194 (1993).

¶ 56    An error in the admission or exclusion of evidence will not constitute reversible error unless one party has been prejudiced or the proceedings have been materially affected. *Wilson v. Humana Hospital*, 399 Ill. App. 3d 751, 758, 926 N.E.2d 821, 829 (2010). In these instances, the question becomes whether the error tipped the scales of justice in favor of the prevailing party–in this case, Matrix. *Los Amigos Supermarket, Inc. v. Metropolitan Bank & Trust Co.*, 306 Ill. App. 3d 115, 129, 713 N.E.2d 686, 696 (1999).

¶ 57    With these principles in mind, we turn to whether the trial court abused its discretion in (1) redacting portions of witness depositions and excluding the Stultzes' letters to the insurance company and (2) allowing evidence that the Estate had been dismissed as a party to the proceedings.

¶ 58                    1. *Whether the Trial Court Erred in Redacting*
                            *Depositions of Witnesses*

¶ 59    Pister claims the trial court erred in redacting testimony of Brian's legal prescription drug use in recorded evidentiary depositions of Brian's family members and excluding letters the Stultzes wrote to Brian's insurance company, as the results made the testimony misleading. We disagree.

¶ 60    Prior to the commencement of trial, Matrix filed a motion *in limine* to bar Pister from arguing Matrix had a duty to prevent Brian's drug use. The trial court went even further by prohibiting all evidence of Brian's legal drug use, reasoning the evidence was both irrelevant and prejudicial because the central issue in the case was not whether Brian was negligent in his driving, which both parties conceded, but whether Brian was on a "special errand" for Matrix at the time of the accident. This ruling resulted in the redaction of portions of

recorded evidentiary depositions of the Stultz family and the exclusion of letters the Stultzes wrote to Brian's insurance company requesting payment of the claim.

¶ 61     Pister argues the resulting redaction of the legal drug use from the videotaped evidentiary depositions misconstrued the testimony of its witnesses, *i.e.*, the family members of Brian, making those witnesses appear biased or motivated to lie in order to obtain financial benefits. At the time of his death, Brian had a life insurance policy that allowed for additional financial benefits if Brian was killed during the scope of his employment. The same policy also allowed the company to deny all financial benefits if Brian was using illegal drugs at the time of his death. Pister contended the insurance company denied Brian's benefits until the family proved Brian was taking the prescription drug oxycodone legally, not because the company denied Brian was within the scope of employment. The redacted recordings, according to Pister, made it seem the family had testified in their depositions that the insurance company denied the Estate's claim due to a question over the scope of his employment. Thus, Pister argues the depositions allowed the jury to believe the Stultzes had a financial motive to lie or misrepresent Brian's scope of employment, when that was not the reality of the case. Matrix, on the other hand, noted the Stultz family did have a financial motive to misrepresent the scope of Brian's employment because they stood to recover additional benefits if the insurance company found Brian was in the scope of employment at the time of his death.

¶ 62     In her brief, Pister presents several instances of redacted testimony to demonstrate how the information could have confused or misled the jury. As an example, Pister complains the court required redaction of the following exchange between a Matrix attorney and Josie Stultz.

> "Q. It appears, just like the last letter we've read over from Robert to the Boilermakers where you agreed you were trying to show that Brian was working, that as of this January 27, 2010 letter to MetLife, you were, again, trying to establish that Brian was working at the time of accident. Is that fair?
>
> A. That was not the crux of the letter. Yes, I never doubted that Brian was working. They denied the claim because of the Oxycodone level, and they told me I had to prove that he was able to have that. That's why they kept denying it. They didn't deny it saying he was not working."

The redacted version of this exchange, as seen by the jury, included only the first two sentences of Josie's answer.

¶ 63     We note, despite Pister's argument to the contrary, Pister was able to rehabilitate the witnesses through later portions of the video depositions shown to the jury, in which the witnesses testified they were not lying in order to obtain financial benefits. From there, it was up to the jury to judge the credibility of the witnesses. See *Snover v. McGraw*, 172 Ill. 2d 438, 448, 667 N.E.2d 1310, 1315 (1996) (it is for the jury to determine the credibility of witnesses and the weight to afford the testimony of those witnesses). It is unlikely the redactions in the recordings misled or confused the jury in this case. Conversely, including information about Brian's legal drug use could have easily confused or misled the jury into believing the drug use was somehow pertinent to the outcome of the case. Even without

-12-

mention of Brian's legal drug use, the testimony at trial established other evidence of bias and motive to lie, namely, the family's opportunity for increased benefits if Brian was found to be within the scope of employment. As the trial court correctly noted, Pister's sole evidence that Brian was on a "special errand" from Matrix came from those family members, so it was appropriate to allow Matrix the opportunity to question the bias and motive of those family members so the jury could determine credibility. See *Rush v. Hamdy*, 255 Ill. App. 3d 352, 363, 627 N.E.2d 1119, 1126 (1993) (a party may demonstrate a witness's interest in the outcome as a means of questioning credibility). Therefore, we conclude the trial court did not abuse its discretion in limiting the recorded testimony because Pister was not prejudiced and the proceedings were not materially affected.

¶ 64    Likewise, we conclude the trial court did not abuse its discretion in barring the letters sent by the Stultzes to Brian's insurance company. Those letters referenced Brian's prescription drug use, which could have inflamed and misled the jury into placing too much emphasis on Brian's drug use.

¶ 65    2. *Whether the Trial Court Erred in Allowing*
*Evidence of Dismissed Party*

¶ 66    Pister next contends the trial court erred in allowing the jury to hear evidence that the Estate had been dismissed from the lawsuit. We disagree.

¶ 67    After voluntarily dismissing the Estate from the lawsuit, Pister filed a motion *in limine* to bar evidence the Estate had previously been a party to the action. Following a hearing, the trial court stated, "there is some common interest between the plaintiff and the Stultz family to the extent that the family of Brian Stultz might benefit from collecting death benefits if [Brian] is found to be in the course of employment." The court denied Pister's motion, reasoning the Estate's prior involvement as a party "may have relevance to certain witness' [*sic*] motive or bias."

¶ 68    During opening argument, Matrix commented, "Now, two mutually opposite stories about welding rods to a jobsite that has no welding. Why would they say that? The reason why they say that, and you're going to hear that because we do have a chance to question them about their motives, about their interests, and they're going to tell you that the original lawsuit was against the estate of Brian Stultz." Pister immediately objected, at which time the court tendered IPI Civil (2006) No. 2.03. The instruction read, "The Estate of Brian Stultz is no longer a party to this case. You should not speculate as to the reason nor may the parties common [*sic*] on why the Estate of Brian Stultz is no longer a party." Following the instruction, Matrix continued, "So the estate of Brian Stultz was originally sued in this case. As His Honor said, why he was, why he wasn't is no longer an issue. The reason why I'm bringing it up is because after he was sued, Mr. Moss, first attorney for the estate of Pisters [*sic*], approached Robert Stultz, the father, and what we contend the evidence will show, addressed the fact that they both had a common interest in seeing that Matrix would be responsible for this accident."

¶ 69    Pister argued the trial court's ruling allowed the jury to speculate why the Estate was released from the case. The trial court, however, found the curative instruction, IPI Civil

(2006) No. 2.03 resolved the issue by instructing jurors not to speculate about the reason for the dismissal.

¶ 70　　"If an extrajudicial agreement has the potential to bias a witness' testimony as to a relevant issue, disclosure is necessary to maintain the fairness and integrity of our judicial system." *Batteast v. Wyeth Laboratories, Inc.*, 137 Ill. 2d 175, 184, 560 N.E.2d 315, 319 (1990). "[E]xtrajudicial agreements which require prior litigants to testify in a certain manner or which create a financial interest for the witness in the successful outcome in the case have the potential to bias a witness' testimony." *Garcez v. Michel*, 282 Ill. App. 3d 346, 349, 668 N.E.2d 194, 196 (1996).

¶ 71　　The cases cited by Pister to support its assertion the trial court erred include situations in which the witnesses entered into settlement agreements with one of the remaining parties. See *Batteast*, 137 Ill. 2d 175, 560 N.E.2d 315; *Eckley v. St. Therese Hospital*, 62 Ill. App. 3d 299, 379 N.E.2d 306 (1978). The case at bar does not present a situation in which the parties entered into a settlement agreement or an extrajudicial agreement to testify in a certain manner. However, the lack of a settlement agreement or extrajudicial agreement between Pister and the beneficiaries of the Estate does not preclude the court from considering other facts which may provide bias or motive to testify in a certain manner. See *Rush*, 255 Ill. App. 3d at 363, 627 N.E.2d at 1126 (a party may question a witness' credibility by demonstrating the witness' interest in the outcome). In this case, the Stultz family may have had a motive to testify on behalf of Pister for several reasons other than reaching an extrajudicial agreement, such as (1) collection of extended benefits under Brian's insurance policy, (2) pursuit of a workers' compensation claim against Matrix, or (3) alleviating some of the blame against Brian.

¶ 72　　The trial court exercised its discretion in determining the jury should hear evidence of the Stultz family's potential bias or motive to lie, and the court's determination was not unreasonable under the circumstances. Though the parties presented no evidence of an explicit agreement between the Stultz family and Pister that the Stultzes would testify a certain way, the jury easily could have found the Stultzes had an interest in the jury finding Matrix liable so that they could pursue their own claim against Matrix or the insurance company. Therefore, we conclude the court did not abuse its discretion in allowing Matrix to question the credibility of beneficiaries of the Estate.

¶ 73　　　　　　　　　　　　C. Whether the Trial Court Erroneously
　　　　　　　　　　　　　　Tendered or Refused Jury Instructions

¶ 74　　Pister asserts the trial court committed several reversible errors with respect to the tendering of jury instructions. Illinois Supreme Court Rule 239(a) (eff. Jan 1, 1999) requires that "[w]henever Illinois Pattern Jury Instructions (IPI), Civil, contains an instruction applicable in a civil case, giving due consideration to the facts and the prevailing law, and the court determines that the jury should be instructed on the subject, the IPI instruction shall be used, unless the court determines that it does not accurately state the law." Ill. S. Ct. R. 239(a) (eff. Jan. 1, 1999). If the trial court finds the IPI instructions fail to accurately state the law, it may tender non-IPI instructions. *Schultz v. Northeast Illinois Regional Commuter*

-14-

*R.R. Corp.*, 201 Ill. 2d 260, 273, 775 N.E.2d 964, 972 (2002). The court has wide latitude in determining which instructions are appropriate, and its decisions will not be overturned absent an abuse of discretion. *Schultz*, 201 Ill. 2d at 273, 775 N.E.2d at 972. "The standard for deciding whether a trial court abused its discretion is whether, taken as a whole, the instructions fairly, fully, and comprehensively apprised the jury of the relevant legal principles." *Schultz*, 201 Ill. 2d at 273-74, 775 N.E.2d at 972-73. "A reviewing court ordinarily will not reverse a trial court for giving faulty instructions unless they clearly misled the jury and resulted in prejudice to the appellant." *Schultz*, 201 Ill. 2d at 274, 775 N.E.2d at 973.

¶ 75    Here, Pister contends the trial court erred by (1) making *sua sponte* comments regarding jury instructions, (2) refusing Pister's IPI jury instructions, and (3) tendering an instruction raising Pister's burden of proof.

¶ 76        1. *Whether the Trial Court Erred in Commenting on the Relationship*

*Between the General Verdict Form and Special Interrogatory*

¶ 77    Pister asserts the trial court erred in commenting, *sua sponte*, about the relationship between a general verdict form and a special interrogatory. Matrix responds Pister has forfeited this argument on appeal by failing to object during trial or offering a remedial instruction. We address Matrix's argument first.

¶ 78    First, Matrix asserts Pister did not object to the court's extrajudicial comment but merely expressed concern. The purpose of an objection is not only to preserve an issue for appeal, but to bring the potential error to the trial court's attention so that it may be contemporaneously addressed. *Guski v. Raja*, 409 Ill. App. 3d 686, 695, 949 N.E.2d 695, 704 (2011). By expressing "concern" over a potential error, Pister brought the issue to the trial court's attention and, in fact, the court reconsidered its statement and made an attempt to remedy the situation. Thus, we conclude Pister's action in "raising concern" adequately brought the issue to the court's attention and preserved the issue for appeal, even without using some form of the word "objection."

¶ 79    Second, Matrix argues Pister forfeited appellate review because Pister failed to tender a remedial instruction. See *Mikolajczyk v. Ford Motor Co.*, 231 Ill. 2d 516, 557, 901 N.E.2d 329, 353 (2008) (a party forfeits review of an allegedly erroneous jury instruction when the party fails to tender an alternative instruction). We disagree. Pister's assertion is the trial court should not have issued the remedial instruction because it called undue attention to the initial error. Therefore, it would have been illogical for Pister to have tendered a remedial instruction. Thus, we conclude Pister's failure to tender a remedial instruction is not fatal, under these circumstances, to the appeal of this issue. We now turn to Pister's argument.

¶ 80    Pister contends the trial court erred in two ways with regard to the special interrogatory, first by making *sua sponte* comments regarding the relationship between the special interrogatory and general verdict form and, second, by issuing a remedial instruction that both emphasized the initial error and limited the jury's deliberations.

¶ 81    During the trial, as the trial court read the jury instructions to the jury, the court explained, "Now, there is something called a special interrogatory. We need this responded

-15-

to, too. It says, it asks a question. 'Was Brian Stultz transporting materials or equipment at Matrix's direction during his drive to Champaign, Illinois? Yes or No.' " The court then added, *sua sponte*, "And you should understand that whether you answer this yes or no determines which one of these two verdict forms you believe is appropriate." It is this additional statement to which Pister called the court's attention.

¶ 82    After a brief hearing, the court issued a remedial instruction over Pister's objection, stating to the jury, "Contrary to anything I may have said earlier, you should first determine your verdict, selecting either Verdict Form A or B. After reaching your verdict, then answer the special interrogatory." Although Pister objected to the court giving a remedial instruction, Pister agreed to the form of the remedial instruction as given.

¶ 83    During the posttrial hearing, the trial court acknowledged committing an error by commenting on the jury instruction, noting, "I should not have said that, and I believe it was error for me to have said that and it just flowed out of my mouth and that's not good. That's bad." We agree, as the trial court conceded, the court committed error with its *sua sponte* remark, as it drew the jury's attention to the relationship between the special interrogatory and the general verdict by inferring they should be consistent, thus allowing the jury to protect its verdict without regard to the evidence.

¶ 84    However, we do not agree the error constituted reversible error. The purpose of a special interrogatory is to "test the general verdict against the jury's conclusions as to the ultimate controlling facts." *Clarke v. Medley Moving & Storage, Inc.*, 381 Ill. App. 3d 82, 94, 885 N.E.2d 396, 408 (2008). "It is reversible error to advise the jury that the special interrogatory and general verdict should conform or to discuss the legal effect of the answer or how it impacts the general verdict." *Lozado v. City of Chicago*, 279 Ill. App. 3d 285, 289, 664 N.E.2d 333, 335 (1996). The central concern is whether the jury has been told to "harmonize" the general verdict with the special interrogatory. *Clarke*, 381 Ill. App. 3d at 94, 885 N.E.2d at 408. For example, telling the jury to conform its answer to the special interrogatory to the general verdict may constitute reversible error because "it allows the jury to protect its verdict without regard to the evidence." *Clarke*, 381 Ill. App. 3d at 94, 885 N.E.2d at 408.

¶ 85    Here, as the trial court explained, the evidence in this case so overwhelmingly favored Matrix that Pister was not prejudiced by the court's error, nor is there any indication the court's ruling misled the jury. In order for reversal on this issue to be appropriate, Pister must demonstrate the instructions, as a whole, "clearly misled the jury and resulted in prejudice to the appellant." *Schultz*, 201 Ill. 2d at 274, 775 N.E.2d at 973. Pister fails to make this showing. The only evidence Pister presented to show Brian was on a "special errand" consisted of conflicting hearsay statements from Brian's family members. Conversely, Matrix presented the testimony of Brian's friends and coworkers and numerous Matrix employees who testified the welding rods and the angle iron were for Brian's personal use. Moreover, the packaging of the welding rods in individual boxes of mixed sizes, rather than in a crate of one-sized rods, indicated the rods were not for use on the jobsite. The trial court was in the best position to determine the impact of his comment on the jury. *Lozado*, 279 Ill. App. 3d at 291, 664 N.E.2d at 337. The court determined, regardless of the error, the verdict would have remained the same. We agree. Therefore, we conclude, while the court did

commit error in making a *sua sponte* statement regarding the relationship between the general verdict and special interrogatory, the error did not clearly mislead the jury or result in prejudice to Pister.

¶ 86      2. *Whether the Trial Court Erred in Refusing Pister's Tendered Pattern*
*Instructions in Favor of a Nonpattern Instruction*

¶ 87      Pister next contends the trial court committed reversible error by rejecting Pister's tendered IPI instructions. During the jury instruction conference, Pister tendered three IPI jury instructions with regard to agency law, two of which were refused by the court. Pister's first refused instruction read:

> "One of the questions for you to determine is whether or not Brian Stultz was acting within the scope of his authority. An agent is acting within the scope of his authority if he is engaged in an activity which has been assigned to him by his principal, or if he is doing anything that might reasonably be said to have been contemplated as part of that activity, which benefits the principal. It is not necessary that an act or failure to act must have been expressly authorized by Matrix Service Industrial Contractors, Inc., a foreign corporation."

See IPI Civil (Supp. 2009) No. 50.06. The second refused instruction read:

> "One of the questions for you to determine is whether or not Brian Stultz was acting within the scope of his employment. An employee is acting within the scope of his employment if each of the following is shown by the evidence:
>
> a. The employee's conduct is of a kind he is employed to perform or reasonably could be said to have been contemplated as part of his employment; and
>
> b. The employee's conduct occurs substantially within the authorized time and space limits of his employment; and
>
> c. The employee's conduct is motivated, at least in part, by a purpose to serve the employer."

See IPI Civil (Supp. 2009) No. 50.06.01. In lieu of the IPI instructions, the trial court tendered a non-IPI instruction, which stated:

> "Brian Stultz was only in the course and scope of his employment at the time of the accident, if he was performing a special errand for Matrix while driving from his home to Champaign, Illinois.
>
> Brian Stultz was performing a special errand in this case only if you find that he was transporting equipment at Matrix's direction during his drive to Champaign, Illinois."

¶ 88      In addressing Pister's posttrial motion, the trial court stated it likely erred by denying Pister's IPI instructions with regard to agency law. We disagree. Where an IPI instruction properly states the law applicable for the present situation, it is incumbent upon the court to tender that instruction to the jury. Ill. S. Ct. R. 239 (eff. Jan. 1, 1999). However, if the jury instruction fails to address the specific law or facts pertaining to the case, it is in the court's discretion to tender a non-IPI instruction. *Schultz*, 201 Ill. 2d at 273, 775 N.E.2d at 972.

¶ 89 In this case, the general agency principles set forth in IPI Civil (Supp. 2009) Nos. 50.06 and 50.06.01 did not adequately address the "special errand" theory of liability presented at trial. Rather, those instructions would have allowed the jury to consider a far broader scope of liability than that presented at trial. For example, the broadly worded instructions in IPI Civil (Supp. 2009) Nos. 50.06 and 50.06.01 would have permitted the jury to consider whether Brian was in the scope of employment as a "traveling employee" despite the court's previous rejection of that theory of liability. Therefore, we conclude the court did not abuse its discretion by refusing the IPI instructions and tendering a non-IPI instruction with regard to Brian's scope of employment.

¶ 90 3. *Whether the Trial Court Tendered Nonpattern Jury Instructions*
*That Raised Pister's Burden of Proof*

¶ 91 In tendering the non-IPI instruction discussed above, Pister argues that the trial court impermissibly raised Pister's burden of proof. Specifically, Pister argues the court's use of "at Matrix's direction" should have instead stated "on Matrix's behalf." The court refused Pister's proposed change to the instruction, stating, "I don't believe a purported agent can impose liability on the principal voluntarily."

¶ 92 Under the Restatement (Second) of Agency (Restatement (Second) of Agency § 228 (1958)), an employee's acts are within the scope of his or her employment if the conduct (1) is of the kind he or she was employed to perform; (2) occurred substantially within the authorized time and space limits; and (3) was actuated, at least in part, by a purpose to serve the master. See *Bagent v. Blessing Care Corp.*, 224 Ill. 2d at 165, 862 N.E.2d at 992.

¶ 93 Pister asserts the language "at Matrix's direction" improperly implied Pister was required to prove that Brian was specifically instructed by Matrix to carry equipment from Ohio to Illinois. Pister argues this language is inconsistent with Illinois law, which requires only that Brian acted with the intention of serving his employer, even if not instructed to do so. Matrix disagrees, asserting Illinois law does not allow for an employee's unilateral actions "on behalf of his employer" to create an agency relationship. See, *e.g.*, *Amcore Bank, N.A. v. Hahnaman-Albrecht, Inc.*, 326 Ill. App. 3d 126, 134, 759 N.E.2d 174, 181 (2001).

¶ 94 The language used by the trial court appropriately stated Pister's burden of proof. It is a well-established rule that employers are generally not responsible for employees coming to or going from work. See *Pyne*, 129 Ill. 2d at 356, 543 N.E.2d at 1307. Therefore, without additional evidence, Pister could not establish, as a matter of law, that Brian was within the scope of employment at the time of the accident merely because he was driving to work. The central issue in this case was whether Brian was completing a "special errand" for Matrix, *i.e.*, whether Matrix directed Brian to take welding rods and other equipment to the Champaign jobsite. The language contained within the non-IPI instruction adequately explained to the jury that, in order to find liability, it had to find Brian was directed on a "special errand" to deliver welding rods to the jobsite. Taken as a whole, the instructions did not mislead or confuse the jury or misstate the law at trial. Thus, we conclude the court did not abuse its discretion in rejecting Pister's "on Matrix's behalf" language from the non-IPI jury instruction.

¶ 95     To preclude future difficulties for trial courts and attorneys in crafting non-IPI instructions with regard to this issue, we suggest the Supreme Court Committee on Jury Instructions in Civil Cases considers creating an IPI instruction setting forth an employer's liability when an employee engages in negligent activity while on a special errand for the employer.

¶ 96                              D. Cumulative Errors

¶ 97     Pister additionally contends this court should reverse due to the cumulative effect of the trial court's errors. See, *e.g.*, *Cretton v. Protestant Memorial Medical Center, Inc.*, 371 Ill. App. 3d 841, 863, 864 N.E.2d 288, 312 (2007). Our analysis uncovered only one error committed by the trial court–the court's *sua sponte* explanation of the special interrogatory's relationship to the general verdict. Because we have already determined the single error did not amount to reversible error, we need not assess this case under the cumulative errors doctrine. See *People v. Bradley*, 220 Ill. App. 3d 890, 904-05, 581 N.E.2d 310, 320 (1991) (the cumulative error doctrine does not apply when the few errors that occurred during the trial did not prejudice the appellant).

¶ 98                                III. CONCLUSION

¶ 99     For the reasons stated, we affirm the trial court's judgment.

¶ 100    Affirmed.

¶ 101    JUSTICE APPLETON, specially concurring.

¶ 102    I concur in the majority's disposition. I write separately to express my opinion that if the plaintiff had persisted in the applicability of the "traveling employee" theory of liability, I would have adopted that argument and found *respondeat superior* liability.

¶ 103    Our supreme court has expressed (as recently as 1998) that a principal may be held liable for the tortious actions of an agent. *Woods v. Cole*, 181 Ill. 2d 512, 517 (1998). That the liability of the principal for tortious conduct of an employee, to date, has been limited only to the context of workers' compensation actions is a legal anomaly unsupported by logic. There are, of course, reasons for businesses to put their employees on the highways, such as an expansion of market share and a reduction of fixed overhead. The demands placed upon traveling employees of time and distance perforce create an increased likelihood of fatigue-caused accidents. If the decedent in this case had been the tortfeasor and Stultz the victim, Stultz's estate could recover (at least in Illinois) from his employer in a workers' compensation action. If that is the case, the employer should be vicariously liable for its decision to require the employee tortfeasor to travel great distances from jobsite to jobsite.

-19-