2016 IL App (1st) 150877

FOURTH DIVISION
March 17, 2016

No. 1-15-0877

THOMAS HOY,                                    )
                                               )
    Plaintiff-Appellant,                      )      Appeal from the
                                               )      Circuit Court of
v.                                             )      Cook County.
                                               )
GREAT LAKES RETAIL SERVICES, INC.,             )      No. 12 L 12771
                                               )
    Defendant-Appellee.                       )      Honorable
                                               )      Kathy M. Flanagan,
(Gabriela Estrada, as Special Representative of the Estate   )   Judge Presiding.
of Kurt Woltmann, Deceased, Defendant).        )

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Presiding Justice McBride and Justice Cobbs concurred in the judgment.

**OPINION**

¶ 1    This appeal presents the question of whether Kurt Woltmann, an employee of defendant Great Lakes Retail Services, Inc. (Great Lakes), was acting in the scope of his employment when he rear-ended a car driven by plaintiff Thomas Hoy. According to Woltmann's deposition testimony, at the time of the accident, he had finished his workday at a job site and was returning to Great Lakes headquarters to have a discussion with Great Lakes' owner, Richard Godfrey. That meeting never ultimately took place; Woltmann never made it back to headquarters that day in light of the car accident. Woltmann said he could not remember the purpose of the aborted meeting, except that it was a "personal matter" and not about the "job itself." Godfrey, in his deposition, denied having scheduled a meeting with Woltmann on the day of the accident and also said that he never spoke to Woltmann about personal matters. The trial court granted Great Lakes summary judgment, finding that Woltmann's "trip to Great Lakes was personal, not job-related, and after his work was completed."

¶ 2    Plaintiff appeals, arguing that a question of material fact exists as to whether the subject matter of the conversation was related to Woltmann's employment, and that summary judgment was thus improper. We agree that this question remains a disputed factual issue on which reasonable minds could differ, but we disagree that this fact is material to the outcome. Even if the purpose of Woltmann's travel to headquarters was to discuss a matter related to work, plaintiff cannot prevail against Woltmann's employer under a *respondeat superior* theory as a matter of law, when Woltmann was merely travelling to a work site after work hours. There are exceptions to this general rule, but we find neither exception applicable to these facts. Thus, we affirm the grant of summary judgment for defendant on a different ground than that reached by the trial court.

¶ 3                                   I. BACKGROUND

¶ 4    Around 1:30 p.m. on August 3, 2012, Woltmann drove into the rear-end of plaintiff's car while plaintiff was stopped at a red light. Plaintiff sued Woltmann for negligence. After taking Woltmann's deposition, plaintiff amended his complaint to add Great Lakes as a defendant under a *respondeat superior* theory. Before Great Lakes had an opportunity to depose Woltmann, he died of causes unrelated to the accident.

¶ 5    Great Lakes moved for summary judgment, alleging that no genuine issue of material fact existed as to its liability for Woltmann's conduct. Great Lakes argued that no reasonable fact-finder could conclude that, at the time of the accident, Woltmann was acting in the scope of his employment. As evidence supporting its motion, Great Lakes attached the depositions of Woltmann, Godfrey, and Godfrey's wife Jennifer, the vice-president of Great Lakes.

¶ 6    In his deposition, Woltmann testified that he worked as a carpenter for Great Lakes. On August 3, 2012, he was installing office furniture at a commercial building in Island Lake,

Illinois. Woltmann said that, once he left the job site, he was "off the clock." He was driving his personal pickup truck at the time and had his "own personal tools" in the truck. He testified that he did not have any of Great Lakes' equipment in his truck and that "[t]he tools that were being used on th[e] job were still at the job [site]." He was wearing a T-shirt with Great Lakes' logo on it.

¶ 7     At the time of the accident, he had left the job site where he had been working that day and was returning "to [his] boss's shop." Woltmann testified that he had been to Great Lakes' office between 5 and 10 times before the accident. Woltmann said that he was going back to the Great Lakes shop in order "to discuss some stuff with" Godfrey, his boss. Woltmann testified that he and Godfrey had "made arrangements for [Woltmann] to come [to the shop] after [he] finished work" earlier in the day during a cell phone conversation. When plaintiff's counsel asked Woltmann about the subject matter of that conversation, Woltmann said that he did not remember. Woltmann said they were not going to talk about "the job itself," and he eventually said that he and Godfrey were going to talk about "personal stuff." Woltmann could not remember whether he had requested the meeting or whether Godfrey had summoned him. Woltmann said that he never ultimately spoke with Godfrey "about what [they] were going to talk about that day."

¶ 8     In his deposition, Godfrey testified that he was the president of Great Lakes, "a fixture installation company" that installed office furniture and performed "light commercial build-outs." He testified that only four people, including his wife and himself, worked at Great Lakes' headquarters. Godfrey did not keep regular office hours, but he was generally in the office from 7 a.m. to 5 p.m. The rest of Godfrey's employees were carpenters, laborers, and other individuals who worked at various job sites. His employees were paid once every two weeks. Employees

kept track of their hours on time sheets that, according to Godfrey, they "typically" turned in via fax or e-mail. If his employees needed to speak with him, sometimes they would call him and sometimes they would speak to him in person.

¶ 9    Godfrey would hold meetings at the office on occasion to "inform the employees of upcoming work, work flow, policies and procedures, things that [they] need[ed] to work on as far as job site conditions, generalities like that." He did not hold these meetings at regular intervals; he would schedule a meeting if the need arose. Godfrey said that he did have an "open door policy" with his employees, where they could talk to him about things if they needed to.

¶ 10    Godfrey testified that he did not recall having scheduled a meeting with Woltmann on the day of the accident, let alone whether he planned to discuss something personal with Woltmann at that meeting. Godfrey said that August 3 happened to be his birthday, so he "probably would not have been in the office much past noon." But he conceded that he did not remember that afternoon or when he left the office. After reviewing Woltmann's telephone records, Godfrey acknowledged that they showed that Woltmann had called his cell phone around 2:02 p.m. on August 3, 2012 (roughly a half-hour after the car accident), but he still did not recall the substance of any conversation with Woltmann.

¶ 11    Godfrey said that his custom was to keep a notepad where he wrote down all of his appointments. He did not know where his notepad for August 2012 was, saying, "It probably would have been filled up and thrown out." He also said he would not have recorded "time *** to meet with employees" on his notepad.

¶ 12    Woltmann worked for Godfrey from January 2012 to September 2012. Godfrey did not know Woltmann before he hired him. Godfrey testified that he "[n]ever" spent time with Woltmann on a social basis; he and Woltmann only had an employer-employee relationship.

Godfrey could not recall speaking to Woltmann about anything other than work. At most, he and Woltmann talked about personal matters in a general sense: "[H]ow's the family, how are the kids, basic stuff like that."

¶ 13    Godfrey said that it would not have been common for him to speak with Woltmann on a daily basis, either in person or over the phone. Around the time of the accident, Godfrey more frequently spoke to the carpenter leading the project, not Woltmann. According to Godfrey, "there could be a situation where [he] may not have spoken to [Woltmann] for up to 2 weeks at a time perhaps." Godfrey testified that Woltmann had been to Great Lakes' office in Huntley before the accident to attend meetings and to pick up his paycheck. Godfrey eventually fired Woltmann after he did not show up for work twice.

¶ 14     In her deposition, Jennifer Godfrey testified that she was married to Godfrey and was the vice-president of Great Lakes. As vice-president, she handled "[p]rocessing, payroll, accounts payable and receivable." She testified that Great Lakes' employees filled out biweekly time sheets that they turned in every other Friday. Employees could e-mail, fax, or personally drop off their time sheets. Jennifer said that Woltmann usually sent in his time sheets via e-mail. She did not recall having any telephone conversations with Woltmann.

¶ 15    Once the time sheets were processed, Jennifer would mail paychecks to Great Lakes' employees on the Monday following the Friday when they handed their time sheets in. Some employees elected to pick up their paychecks in person, but Woltmann did not.

¶ 16    Jennifer did not recall her and Godfrey's plans for his birthday on August 3, 2012. But she said that they "always" had plans for his birthday, such as spending time with their children or going out to eat. She did not recall when she and Godfrey left the office on August 3, 2012, but she said that she "would have made him" leave early for his birthday.

¶ 17    Along with the three depositions, Great Lakes attached Woltmann's cell phone records, which showed that he placed a call to Godfrey's cell phone at 2:02 p.m. on August 3, 2012. It also attached a map with three locations highlighted: the site of Great Lakes' office, the site of the collision, and Woltmann's home. The collision occurred closer to Great Lakes' office than Woltmann's home.

¶ 18    In response to Great Lakes' motion for summary judgment, plaintiff argued that the deposition testimony and phone records showed that Woltmann was on his way to meet with Godfrey when the accident occurred. And, plaintiff added, "the purpose behind the meeting *** could only have been related to Woltmann's employment," as Godfrey testified that "the two of them strictly had an employee-employer relationship and never saw each other socially." According to plaintiff, the fact that Woltmann said he and Godfrey were going to discuss personal matters did not dispel "the implications such a discussion between employer and employee may have on an individual's ability to fulfill his responsibilities in furtherance of his employer's business and his efforts to serve his master."

¶ 19    The trial court granted the motion for summary judgment. The court noted that, in order for Great Lakes to be liable for Woltmann's negligence, the evidence must show that Woltmann was acting in the scope of his employment with Great Lakes at the time of the accident. The court noted that the evidence showed that, on August 3, 2012, Woltmann was done with work for the day, was driving his own vehicle, and was not returning any of Great Lakes' property to the office. And while Woltmann said that he was going to the office to speak with Godfrey, the court noted that Woltmann "testified that he was not going to talk about the job itself." Thus, the court found that "his trip to Great Lakes was personal, not job-related."

¶ 20    Plaintiff filed a motion to reconsider the award of summary judgment, which the trial court denied. This appeal followed.

¶ 21                                    II. ANALYSIS

¶ 22    Plaintiff claims that the trial court erred in awarding Great Lakes summary judgment because a reasonable juror could conclude that Woltmann was acting in the scope of employment when he was driving back to Great Lakes' office to speak to Godfrey. Great Lakes argues that Woltmann was not acting in the scope of employment, where he was done with work for the day and was going to talk with Godfrey about a personal matter, not to serve Great Lakes.

¶ 23    Summary judgment is proper where the pleadings, depositions, admissions, and affidavits on file, when viewed in the light most favorable to the nonmoving party, reveal that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Hall v. Henn*, 208 Ill. 2d 325, 328 (2003). We must construe pleadings, depositions, admissions, exhibits, and affidavits strictly against the moving party and liberally in favor of the nonmoving party. *Pyne v. Witmer*, 129 Ill. 2d 351, 358 (1989). We review the entry of summary judgment *de novo*. *Hall*, 208 Ill. 2d at 328.

¶ 24    Under the theory of *respondeat superior*, an employer may be liable for the torts of an employee, but only when the employee commits the tort within the scope of his or her employment. *Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 163 (2007). When determining whether an employee has acted within the scope of employment, Illinois courts look to the Restatement (Second) of Agency § 228 (1958), which states that an employee's conduct is within the scope of employment if three criteria are met: (1) it is of the kind the employee is employed

to perform; (2) it occurs substantially within authorized time and space limits; and (3) it is actuated, at least in part, by a purpose to serve the employer. *Bagent*, 224 Ill. 2d at 164.[1]

¶ 25    It is well settled that, when scope of employment is at issue, summary judgment is generally inappropriate. *Id.* at 165. " 'Only if no reasonable person could conclude from the evidence that an employee was acting within the course of employment should a court hold as a matter of law that the employee was not so acting.' " *Id.* at 165-66 (quoting *Pyne*, 129 Ill. 2d at 359).

¶ 26    In this case, plaintiff argues that a factfinder could reasonably conclude that Woltmann was acting within the scope of his employment when he was driving back to Great Lakes' headquarters from his job site because Woltmann testified that, although he had completed his carpentry work for the day, he was going back to have a conversation with his boss, Godfrey. Plaintiff notes that, while Woltmann said that he was going to discuss an unspecified personal matter with Godfrey, Godfrey said that he and Woltmann had a purely professional relationship. Thus, plaintiff argues, a reasonable factfinder could conclude that, when the accident occurred, Woltmann was driving back to Great Lakes in order to have a work-related discussion with Godfrey.

¶ 27    The trial court found otherwise, reading Woltmann's deposition testimony that he was going to discuss "personal stuff" with his boss that was not about "the job itself."

¶ 28    We agree with plaintiff that Woltmann's reference to "personal stuff" did not automatically mean that the conversation was unrelated to his employment. Woltmann did not

---

[1] "The Third Restatement of Agency states the test in more general terms, but with essentially the same meaning." *Nulle v. Krewer*, 374 Ill. App. 3d 802, 805 n.1 (2007) (citing Restatement (Third) of Agency § 7.07, cmt. b, at 199 (2006)).

specify the subject matter of the conversation. A topic that is "personal" could, of course, be something wholly unrelated to work, like a discussion of one's marital problems or any other intimate issue that friends might discuss. But Woltmann's boss, Godfrey, made it very clear that he and Woltmann did not have a social or friendly relationship, that they barely knew each other, that they rarely spoke and, when they did, the conversation covered work or just the perfunctory social greeting. It is not difficult to imagine any number of instances where an employee might need to discuss a sensitive personal issue with the boss not because the boss is a close, personal friend, but because it would have an effect on the employee's job. For example, an employee might have a health problem that would require some time off or an adjustment to a work schedule, which the employee might consider "personal" and not about "the job itself" but which, in a larger sense, is still work-related. Woltmann was a lay person merely testifying about the reason his car was where it was on the day in question. He was not a lawyer trying to thread a needle. The question of *respondeat superior* was not an issue in the case at that point, as Great Lakes was not yet a party-defendant. It is at least reasonably possible that, when Woltmann agreed that the matter was "personal" and not about "the job itself," he could have meant something "personal" in the sense that it was unique to himself or something of a sensitive nature, as opposed to something about the specific work he was performing for the company— but was still work-related in a larger sense.

¶ 29    But even if there was a question of fact regarding the purpose of Woltmann's conversation with Godfrey, we find that other grounds exist for affirming the grant of summary judgment. We review the trial court's ultimate judgment, and we may affirm a grant of summary judgment on any basis in the record, regardless of whether it was the trial court's reasoning or whether the trial court's reasoning was correct. *Northern Illinois Emergency Physicians v.*

*Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 305 (2005); *Harlin v. Sears Roebuck & Co.*, 369 Ill. App. 3d 27, 31-32 (2006).

¶ 30 Other grounds exist for entering summary judgment because, even if we assumed that Woltmann was returning to talk to Godfrey about a topic related to work, that assumption would not place Woltmann's trip to Great Lakes' office within the scope of his employment. As our supreme court has explained:

> "Generally, an employee traveling to or from work outside actual working hours is not in the scope of employment, but an exception exists for employees who are caused by their employers to travel away from a regular workplace or whose travel is at least partly for their employers' purposes rather than simply serving to convey the employees to or from a regular jobsite." *Pyne*, 129 Ill. 2d at 356.

¶ 31 The general rule in *Pyne* suggests the common-sense principle that an employee commuting to or from work is not acting within the scope of employment. *Id*. The most common example would be an employee driving to work in the morning, or leaving from work at night, in each case driving outside work hours. See *Pister v. Matrix Service Industrial Contractors, Inc.*, 2013 IL App (4th) 120781, ¶ 94 ("well-established rule that employers are generally not responsible for employees coming to or going from work" (citing *Pyne*, 129 Ill. 2d at 356)); *Hall v. DeFalco*, 178 Ill. App. 3d 408, 413 (1988) ("Generally, an accident occurring while an employee is traveling to or from work is not considered as arising out of or in the course of employment."). The key point is that there is nothing work-related about the travel *except* that it gets the employee to work—it "simply serv[es] to convey the employees to or from a regular jobsite." *Pyne*, 129 Ill. 2d at 356.

¶ 32    Under the general rule in *Pyne*, plaintiff could not prevail under a *respondeat superior* theory against defendant. Even if, as plaintiff claims, "Woltmann was on his way back to the company office to talk to Godfrey about work matters" at the time of the accident, he has established nothing more than the fact that he was traveling to his workplace. That, by itself, is not enough under *Pyne* to establish *respondeat superior* liability.

¶ 33    The first exception in *Pyne* applies *respondeat superior* liability where employees, outside work hours, are "caused by their employers to travel away from a regular workplace." *Id.* at 356. A good example of that exception is *Pyne* itself, where the employee was directed by his employer to drive to a nonwork location to take an evening exam as part of his certification to be an auto mechanic. *Id*. at 355. The supreme court agreed with the parties that this travel to and from that facility was within the scope of employment, because the employer had directed the employee to an off-site location (*id*. at 356); the disputed question there was a question not before us, whether the employee had *deviated* from that scope by traveling to another destination before heading home, and thus whether the employee was engaged in a "frolic" at the time his car collided with plaintiff's car. *Id*. at 360-63.

¶ 34    This first exception is not applicable to this case. Woltmann was not directed away from a job site to a nonwork location. He was driving *toward* a work site. The fact that he did not travel to company headquarters routinely, on a daily basis, and instead did most of his work at job sites to which he was dispatched, does not change the fact that the company headquarters was a regular work site. "The court in *Pyne* did not refer to a single, normal workplace; instead, it referred to a 'regular jobsite.' " *Marco v. County of McHenry*, 218 Ill. App. 3d 503, 507 (1991) (quoting *Pyne*, 129 Ill. 2d at 352). In *Marco*, a county board member got into a car accident on his way to a committee meeting at the courthouse. *Id*. The board member had attended 13

meetings at the courthouse in the 7 months preceding the accident. *Id.* at 505. The plaintiff argued that the courthouse was not a regular work site, citing evidence that this board member did much of his county work in different locations. *Id.* at 507. This court disagreed, noting that *Pyne* never suggested that there could only be *one* regular job site and that the county board member "often attended board committee meetings at the McHenry County courthouse as a part of his duties as a board member." *Id.* Thus, the board member was clearly traveling to a job site, doing nothing more than conveying himself to that site, and the trial court properly entered summary judgment in the employer's favor on the issue of *respondeat superior*. *Id.*

¶ 35    Likewise, in this case, Woltmann had travelled to Great Lakes headquarters between 5 and 10 times in the less than 8 months preceding the accident to attend staff meetings. The company headquarters was obviously not his only job site, but it was a regular job site no less.

¶ 36    Plaintiff, particularly in his reply brief, seems to focus more on the second exception in *Pyne*. The second exception, which permits *respondeat superior* liability for employee travel to and from work, is where the travel is within the scope of employment because the "travel is at least partly for their employers' purposes rather than simply serving to convey the employees to or from a regular jobsite." *Pyne*, 129 Ill. 2d at 356. Plaintiff argues that a reasonable factfinder could conclude that Woltmann was summoned to company headquarters to discuss a work-related matter, and thus the trip was for the employer's purposes. We will assume those favorable facts at this stage, but the legal conclusion drawn from those facts misconstrues *Pyne* and its progeny. An employee driving to work is *always* doing so at the direction of the employer and to do whatever the employer asks him or her to do, once there. If that were all it took to establish that travel to work was "at least partly for their employers' purposes" (*id.*), this

exception would swallow the general rule in *Pyne* that travel to and from work is not enough, by itself, to establish *respondeat superior* liability. *Id*.

¶ 37    The focus is not on what the employee did at work once he or she arrived, or whether the employer asked the employee to come to work. The focus is on the travel itself. If the only thing the travel accomplishes is literally transporting the employee to a work place—if it "simply serv[es] to convey the employees to or from a regular jobsite" (*id.*)—the general rule in *Pyne* applies. It is only if there something unique about the *travel itself* that serves the employer's purpose, other than the mere transport of the employee to the job site, that this exception to the general rule applies.

¶ 38    For example, an employee might be hauling materials to the work site, such that his travel in an automobile serves not only to bring the employee to work but also to bring work-related materials to the job site. See *Pister*, 2013 IL App (4th) 120781, ¶ 94. *Pister* cited the "well-established rule that employers are generally not responsible for employees coming to or going from work" and noted that, "without additional evidence, [plaintiff] could not establish, as a matter of law, that [the employee] was within the scope of employment at the time of the accident merely because he was driving to work." *Id*. The court found that, had plaintiff convinced the jury that the employee had been hauling welding rods to the work site at his employer's direction, the employer could have been held liable for the employee's negligence in the car accident under a *respondeat superior* theory. *Id*.

¶ 39    Another example of this second exception, permitting *respondeat superior* liability for employee travel outside working hours, would be if the purpose of the travel was not merely to drive an employee from work but also to transport *other* employees from work, pursuant to a stated company policy. See *Hall*, 178 Ill. App. 3d at 413. In *Hall*, the manager of a McDonald's

restaurant was driving another employee to the train station after that employee had finished work for the day. *Id.* at 410. Transporting employees to the train station after work was one of the manager's duties, pursuant to McDonald's Corporation's policy. *Id.* These facts placed the case "within the exception to the general rule because the McDonald's Corporation had performed an affirmative act in providing its employees with a means of transportation to or from work." *Id.* at 414. The purpose of the manager's travel in the car, in other words, was not merely to convey himself from work but to serve the employer's interest, to further the employer's policy of giving other employees a ride from work to suitable transportation home.[2]

¶ 40    Plaintiff cannot establish any facts that fit within this second exception to the general rule in *Pyne*. There was nothing about Woltmann's travel in his car that day that uniquely served his employer's purpose, beyond the fact that the car was transporting Woltmann to the company

_____

[2] We acknowledge that *Hall* involved a different posture, in which the case was more about scope-of-employment under workers' compensation laws than about *respondeat superior*. In *Hall*, the defendant was not the corporation trying to avoid *respondeat superior* liability but the store manager who was driving the plaintiff employee to the train station after work when the car accident occurred. *Hall*, 178 Ill. App. 3d at 409. The plaintiff in *Hall* had already obtained relief from the corporation through workers' compensation proceedings. *Id.* at 410. The defendant in *Hall* was thus arguing that, because the accident happened within the scope of his employment with McDonald's, and because plaintiff had already obtained relief from McDonald's under workers' compensation laws, the civil lawsuit was barred by the exclusivity provision of the workers' compensation statute. *Id.* at 414. We have discussed *Hall*, nevertheless, for several reasons. First, plaintiff has cited it for support. Second, at least one court has considered *Hall* to be a *respondeat superior* case. See *Pister*, 2013 IL App (4th) 120781, ¶ 51. Third and most importantly, the supreme court in *Pyne*, in discussing the principles of *respondeat superior*, cited *Hall* in support. See *Pyne*, 129 Ill. 2d at 356 (citing *Hall* as exception to general rule of nonliability for employee travel to and from work).

office. Woltmann stated that he was not returning materials or returning a company car. He was merely conveying himself to the office. It may be true that he was summoned by his boss to the office, but that fact is irrelevant to the inquiry. If the ultimate goal of the travel is nothing more than conveying the employee to a regular work site, *respondeat superior* liability does not attach. *Pyne*, 129 Ill. 2d at 356; see *Marco*, 218 Ill. App. 3d at 507 (finding second *Pyne* exception inapplicable where county board member's travel to courthouse for committee meeting "served merely to convey him to a regular jobsite" and "was not otherwise at all intended to serve the Board's purposes").

¶ 41    The general rule in *Pyne* controls the disposition of this case. Woltmann was not acting within the scope of his employment with Great Lakes when he drove himself to a regular workplace to attend a meeting with his employer. Because there was no question of material fact regarding the scope of employment in this case, and defendant was entitled to judgment as a matter of law, we affirm the grant of summary judgment in defendant's favor.

¶ 42                                    III. CONCLUSION

¶ 43    For the reasons stated, we affirm the trial court's award of summary judgment to Great Lakes.

¶ 44    Affirmed.