NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 250345-U

NO. 4-25-0345

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 21, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* Adoption of H.A., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (Talib A., | ) | Stephenson County |
|     Respondent-Appellant, | ) | No. 23AD2 |
|     v. | ) | |
| Lisa C. and Bill C., | ) | Honorable |
|     Petitioners-Appellees). | ) | Peter McClanathan, |
| | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court.
Presiding Justice Harris and Justice Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's determination in this involuntary adoption case that respondent was unfit was not against the manifest weight of the evidence.

¶ 2    On November 15, 2024, the trial court found respondent, Talib A., unfit pursuant to sections 1(D)(d) and (h) of the Illinois Adoption Act (Act) (750 ILCS 50/1(D)(d), (h) (West 2024)). On March 11, 2025, the court found it was in H.A.'s best interests to terminate respondent's parental rights. Respondent appeals, arguing the court's determination he was unfit was against the manifest weight of the evidence. We affirm.

¶ 3                                I. BACKGROUND

¶ 4    On February 21, 2023, petitioners, Lisa C. and Bill C., filed a verified petition for the adoption of H.A. (born October 2017) after the death of H.A.'s mother, Shannon G., earlier that month. Lisa was Shannon's mother. Petitioners alleged they took custody of H.A. on February

4, 2023. Respondent, H.A.'s father, did not consent to the adoption. However, according to petitioners, because respondent was unfit under the Act (see 750 ILCS 50/1(D)(a), (b), (d), (e), (g), (h), (k), (o) (West 2022)), his consent to the adoption was unnecessary. Petitioners were already in the process of adopting H.A.'s half-sister, R.A. (born December 2014) and had already adopted three of Shannon's older children.

¶ 5        On March 21, 2023, respondent filed a motion to dismiss the petitions for adoption and interim custody pursuant to section 2-619 of the Code of Civil Procedure (735 ILCS 5/2-619 (West 2022)), alleging he filed an emergency motion for temporary relief and a petition for allocation of H.A.'s parenting time and significant decision making responsibility on March 9, 2023, in Stephenson County case No. 23-FA-28. Alternatively, respondent asked for the adoption case to be stayed pending resolution of the case he filed.

¶ 6        On April 18, 2023, the trial court entered an order, finding it had subject matter jurisdiction and personal jurisdiction over the parties, Stephenson County was a proper venue in both cases, and the parties had standing in both cases. The court determined it had statutory authority to proceed first in either case but found it most appropriate to proceed first in the adoption case. Respondent does not challenge that decision on appeal.

¶ 7                              A. Stage-One Evidentiary Hearing

¶ 8        On July 22, 2024, the trial court began a stage-one evidentiary hearing to determine whether petitioners could establish by clear and convincing evidence that respondent was unfit.

¶ 9                              1. *Respondent's Testimony*

¶ 10       On October 24, 2018, respondent was arrested on a domestic battery charge involving Shannon. In recorded statements to the police, respondent denied battering Shannon or any other woman However, respondent admitted he told a police officer that he and Shannon were

arguing while H.A. and R.A. were awake, but he said the argument did not occur in front of the children. Respondent told the police he grabbed the telephone away from Shannon when she called 911 and left the residence when he learned police officers were on their way. When asked how Shannon's face became red and swollen that day, respondent said Shannon fell a lot when she drank and bruised quickly. Respondent could not explain why the police officers noted he had been drinking but said nothing about Shannon drinking that day. Moreover, respondent claimed he did not know why two summonses for Shannon to appear for the trial on the 2018 domestic battery charge went unserved.

¶ 11　　　　In 2019, respondent testified he and Shannon were living together at his home on McConnell Road. When asked whether another domestic battery allegedly occurred on June 26, 2019, respondent testified, "I don't know, I don't remember." He also testified he did not remember being charged with four counts of domestic battery, two counts of child endangerment, and one count of obstructing service of process on Shannon. Respondent admitted pleading guilty to domestic battery and obstructing service of process on Shannon between June 26, 2019, and December 19, 2019. The child endangerment charges were dismissed. During his testimony, respondent admitted he interfered with Shannon being served with a summons in the 2018 domestic battery case against him.

¶ 12　　　　Respondent testified H.A. and R.A. were removed from his home for two or three months after the June 26, 2019, incident and placed with his friend, Mohammed A. According to respondent, even though he had been charged with child endangerment and Shannon had not, the Illinois Department of Children and Family Services (DCFS) told him he could see the children at any time but Shannon could not have unsupervised visits.

¶ 13　　　　Respondent claimed he did not know how Shannon got two black eyes on June 26,

2019, but said her injuries, including multiple bruises and lacerations on her hands, neck, and collar bone, were probably the result of a drunken fall and were not from him. Respondent did not remember ever calling Shannon "a whore" or "cheap meat." He also denied ever calling H.A. or R.A. "bitch" and said he did not remember that Shannon and the girls moved out of his house in August 2021. At that time, respondent had not worked in three years and had no income.

¶ 14     Respondent testified he did not remember sending texts to Shannon—after she and the girls moved out—saying he was going to starve and had not eaten in days or asking Shannon to bring him beer, "smokes," and soap so he could shower. While admitting the number stated was his phone number, respondent did not remember if he had that number in 2022 and denied sending the text messages in petitioners' exhibit No. 8. Respondent did not remember texting Shannon he could not watch H.A. and R.A. if he did not have "smokes," he was not going to do anything else for Shannon, like watching the girls, or he needed alcohol and cigarettes for watching the girls.

¶ 15     After learning Shannon died in February 2023, respondent went to the police station to get the girls back. When asked why he did not call the police back after an officer called him, respondent said, "Maybe I didn't catch the message." Respondent said he did not know why Mohammed later returned to the police station by himself looking for the girls.

¶ 16     Respondent wanted H.A. to continue school in Orangeville, Illinois, but could not name her former teacher. He acknowledged the police did a welfare check on R.A. on January 21, 2020, because she was missing so much school, but he blamed Shannon for R.A.'s absences.

¶ 17     Respondent testified he currently worked at Stoughton Trailers, which was a job he obtained after Shannon died. He worked five days a week from 4:30 p.m. to 3 a.m., with some overtime. Respondent testified he had never paid child support for H.A.

¶ 18     With regard to H.A.'s teeth, respondent knew she had a "little hole," but he blamed

- 4 -

Shannon. Respondent claimed he wanted to take H.A. to the dentist after Shannon's death, but petitioners refused. Respondent claimed he never saw any dental bills from petitioners.

¶ 19   According to respondent, petitioners obtained a "no trespass order" against him, which prohibited him from going to their house. Although the parties referred to this as a "no trespass order," it appears the parties are actually referring to a "trespass notice." He admitted the notice did not keep him from going anywhere other than their home. Respondent did not know H.A.'s teachers or grades and had not attended any of her school events for over 18 months. Respondent said an attorney advised him not to contact H.A.'s school, and petitioners blocked his calls. He denied knowing petitioners had asked him for financial support for H.A.'s care.

¶ 20   2. *Testimony of Various Police Officers*

¶ 21   Sergeant Anthony Miller of the Stephenson County Sheriff's Office testified he was dispatched to respondent's home after 7 p.m. on October 24, 2018, in response to a 911 call. Shannon was upset, nervous, and scared. Her breath smelled strongly of alcohol, and she was crying and shaking. Her face also appeared unusually red. Miller believed he was met by a one-year-old child in the house and learned a four-year-old child was also present. Miller said he was not familiar with Shannon and did not know if the redness in her face was unusual.

¶ 22   Stephenson County Deputy Sheriff Josh Garrett testified he was also dispatched to the domestic disturbance on October 24, 2018, and located respondent. Respondent denied ever hitting a woman and said he left the house to "cool off." Garrett indicated Mohammed came into the police station by himself on February 10, 2023, after Shannon's death and dropped off a plan from DCFS. Garrett called respondent and left a voicemail. He did not believe respondent returned his call.

¶ 23   Stephenson County Deputy Sheriff Keven Krahmer performed a welfare check on

Shannon and the children at respondent's residence in June 2019. Shannon had bruises on her body (upper chest, neck, arm, and face) and her left eye was swollen and bruised. Shannon said she was afraid of respondent and wanted to move south with her children and disappear. Respondent was not at the residence, but Krahmer encountered him a short distance away. Respondent smelled of alcohol and admitted having four beers. When Krahmer arrested respondent, respondent made a comment that men are always arrested for striking women but women are not arrested for hitting men. Respondent said Shannon bruised easily but denied injuring her. Krahmer issued citations to respondent for child endangerment and domestic battery. Shannon was not charged.

¶ 24        Stephenson County Deputy Jaime Hare testified he went to respondent's residence on November 2, 2019, to serve Shannon with a summons to appear in court as the victim of a domestic battery involving respondent. When respondent answered the door, he said Shannon lived in Freeport, Illinois, and denied having an address or phone number for her and shut his door. Hare then determined respondent had a warrant for violating an order of protection, waited for another officer to arrive, and then went back and asked respondent again whether he had any way of contacting Shannon. After respondent said no, Hare heard a thud inside the house. Respondent tried to shut the door again, but Hare entered the house, informing respondent he had a warrant for respondent's arrest. The two officers began yelling for anyone in the house to come downstairs. The officers encountered Shannon and two children. The officers arrested respondent and issued him citations for violating an order of protection and obstructing service of process on Shannon.

¶ 25        On February 10, 2023, Deputy Hare again had contact with respondent and Mohammed. Respondent was upset because Shannon had died on February 5, 2023, and the sheriff's office had not contacted him to let him know where his children were. Hare testified he asked respondent to spell his children's names and respondent could not do it, nor could he initially

remember H.A.'s birth date. Respondent incorrectly said R.A.'s birthday was December 2, 2018.Mohammed said the police should get the children back for them, and they had no need to talk to the police. Respondent said he would return later with paperwork stating he was the children's father but did not.

¶ 26                                    3. *Testimony of Lisa C.*

¶ 27          Lisa testified Shannon was her daughter. In early 2023, before Shannon's death, she and Shannon communicated daily, mostly through Facebook Messenger. Lisa identified Shannon's cell phone number. After Shannon died, Lisa immediately went to Shannon's apartment, where Shannon had lived since August 21, 2021, found Shannon's cell phone, and had kept it in her possession since then. Lisa took pictures of things on Shannon's phone with her phone. Shannon listed respondent on her phone as "BD" or "baby daddy," and the phone number for "BD" or "baby daddy" matched the phone number Lisa had for respondent on her phone. Lisa had heard from respondent from that number both before and after Shannon died.

¶ 28          Petitioners moved to admit their exhibit No. 8, which contained screenshots of messages allegedly between respondent and Shannon. Respondent argued a proper foundation for the messages had not been established and contended Shannon might have deleted or modified messages on her phone prior to her death. The trial court admitted the messages and indicated it would entertain other text messages presented to the court.

¶ 29          Lisa testified she had known respondent for seven years and had interacted with him in person, been to his house, and exchanged cell phone messages with him. She was not aware of respondent making any child support payments to Shannon for H.A. Lisa and her husband Bill frequently provided Shannon with financial support, including money to feed and clothe H.A. and pay Shannon's rent. Since Shannon's death, respondent had provided no money for H.A.'s support.

He also had not sent any letters, cards, or gifts to H.A. at Lisa's house. To her knowledge, respondent was not prohibited from helping support H.A. or sending letters or gifts. While respondent claimed he sent a box with presents and supplies to Lisa's house, Lisa testified she had not heard anything of this and did nothing to interfere with any delivery from respondent. As for the trespass notice, Lisa said she obtained it to keep respondent from coming to her house.

¶ 30    After Shannon's death, Lisa noticed H.A. was missing half of one of her molars. Lisa took H.A. to the dentist, who referred them to a specialist. H.A. needed expensive repairs to her teeth. Respondent did not offer to pay for or reimburse Lisa for any of these expenses. Lisa testified both respondent and his attorney were notified of the expenses.

¶ 31    According to Lisa, for the first few months H.A. and R.A. were living with her, they talked about things that happened in respondent's home about every week. When R.A. talked about respondent, she seemed scared and unhappy. Lisa said R.A. is normally a happy child. As for H.A., she would cry when she talked about respondent. According to Lisa, while Shannon was preparing to leave respondent, she was scared, fidgety, cried, and was very angry.

¶ 32    On cross-examination, Lisa testified she spoke with respondent on the phone for a few minutes a few days after Shannon died. He asked if the girls were alright. When respondent and Shannon were together, respondent messaged Lisa when Shannon was in the hospital or having health complications because of her alcoholism. Lisa did not remember ever blocking respondent from calling her phone. However, she also testified she had not reached out to respondent since the start of this litigation and did not tell respondent that Shannon had passed away. Further, respondent had not come to her residence before she obtained the trespass notice.

¶ 33    On redirect, Lisa testified she did not tell respondent about Shannon's death because Shannon and respondent were not together, H.A. and R.A. were safe, and the girls were

afraid of respondent. Lisa said she would have informed respondent of H.A.'s school report cards, medical records, immunization records, pictures, and information about birthday parties and summer camp activities if he had asked.

¶ 34                                    4. *Testimony of Bill C.*

¶ 35        Bill testified he was Lisa's husband. Bill said he had not received any money from respondent, nor had respondent offered any money for H.A.'s support. According to Bill, he was not aware of anything prohibiting respondent from providing money for H.A. While Bill and Lisa had a trespass notice prohibiting respondent from coming to their house, it did not prohibit respondent from doing anything else. Bill had neither seen cards, letters, gifts, nor any other tokens of love and/or affection for H.A. from respondent, nor had he seen respondent at any of H.A.'s extracurricular activities. Bill stated R.A. gets quiet and narrows her eyes when respondent is mentioned. As for H.A., while normally outgoing and happy, she usually starts crying shortly after the mention of respondent's name.

¶ 36                                    5. *Testimony of R.A.*

¶ 37        In the trial judge's chambers, R.A. testified she was nine, went to elementary school in Freeport, and understood the difference between the truth and a lie. She explained, "The truth is, like, you're telling someone the exact thing that *** happened," and a lie is the opposite. She promised to only tell the truth during her testimony and to say she did not know the answer to questions if that were the case. R.A. said she remembered both living with respondent and her mother and living with just her mother. She also remembered taking the bus to respondent's house and staying there until her mother picked her up.

¶ 38        According to R.A., when she lived with respondent and when she stayed at his house after school and in the evening, respondent did not cook and had nothing to eat in the

refrigerator. Even when she told him she was hungry, respondent did not get her food, which made her sad. She also said respondent was mean to her and called her names like the "B-word." R.A. said this happened a lot. R.A. testified she could not take a shower or bath at respondent's house "[b]ecause he couldn't afford it." When asked how she knew that, R.A. said, "Because if we didn't have any food, then I know he couldn't afford for water to take a shower." R.A. also said respondent did not have hot water, soap, or shampoo. In addition, R.A. told the trial court respondent did not help her with homework, was not interested in what she did at school, and did not play with her. She also said respondent's house was cold in the winter and he did not have blankets. R.A. indicated she did not like being at respondent's house.

¶ 39    R.A. claimed respondent never bought her Christmas gifts. While they put a Christmas tree up, respondent did not like it. Her mother had told her respondent burned their Christmas tree. They had to cut down a Christmas tree and decorate it after respondent got rid of their tree, which made her sad. In addition, R.A. said respondent never got her anything for Easter, Valentine's Day, or her birthday.

¶ 40    Regarding physical violence she witnessed, R.A. testified she saw respondent hit her mother many times, which made her feel scared. She said her mother was also scared, would cry when respondent hit her, and would sometimes have bruises all over her body. Respondent also called her mother mean names. R.A. said respondent also hit her and H.A., which left red marks that turned to bruises. She also testified respondent called H.A. the "B-word" and the "F-word," which made R.A. feel scared.

¶ 41    While she was not happy living with respondent, she was happy living with her mother and her grandparents. R.A. said she missed her mother but not respondent, whom she hated. After petitioner's counsel asked R.A. if she wanted to tell the trial judge anything else, R.A. said

they "would have to get a bucket of water from somewhere" when they wanted to bathe at respondent's house.

¶ 42          R.A. said no one told her why she was at the courthouse that day, what questions she might be asked, or what she should say. However, she said her grandmother told her about a month earlier that she was going to talk to a judge.

¶ 43          According to R.A., after her mother moved R.A. and H.A. out of respondent's house, she still went to respondent's house every day after school until her mother picked her and H.A. up around 11 p.m., when she got off work. R.A. said she stayed awake until her mother arrived. She did not remember her mother taking her to the dentist. She did remember being on the trails by respondent's house with H.A., respondent, and maybe her mother, which R.A. sometimes enjoyed.

¶ 44          During her time living with her grandparents, R.A. said they sometimes raised the topic of R.A.'s mother and respondent, asking if Shannon had ever been hurt. However, R.A. also said her grandparents never brought things up about respondent, and she did not, either. R.A. did talk about her mother and how much she missed her mother with her grandparents on her own initiative. R.A. said her mother got sick because of how much she drank.

¶ 45                              6. *Testimony of H.A.*

¶ 46          In the trial judge's chambers, H.A. testified she was six years old and would be starting first grade in the fall. H.A. initially said she did not know what the judge meant when he talked about the truth. The judge then asked H.A. if he would be telling the truth if he said he was wearing a white shirt. She said yes. The judge then asked her if he would be telling the truth if he said he had on a black shirt. She said no. The judge then asked H.A. if he would be telling the truth if he said H.A. was 20 years old. She said no. The judge then asked H.A. whether he would be

- 11 -

telling the truth if he said H.A. was six years old. H.A. said yes. H.A. promised she would only tell the truth while testifying.

¶ 47    H.A. said she remembered living with respondent and her mother and living with just her mother. While at respondent's house, respondent did not cook for her and had nothing for her to eat, even when she told respondent she was hungry. She said respondent was not nice to her, said mean things in a loud voice, and yelled at her a lot. She did not remember the mean things he said to her, but he called her names. H.A. said she could not take a bath or shower at respondent's house because respondent did not have water. She also claimed respondent did not play with her, help her with the alphabet or counting, or talk to her about school. According to H.A., respondent's house was cold, and he never took her to the doctor or dentist. However, she also said her mouth did not hurt before she recently started going to the dentist.

¶ 48    H.A. testified she did not like being at respondent's house. She said it was cold, he did not have food or water, she and R.A. did not have their own beds, and they had to sleep in respondent's bed. In addition, she said respondent never got her any Christmas gifts and burned down their Christmas tree. She claimed neither her mom nor respondent gave her an Easter basket or candy, but her mother did give her a Valentine's Day gift. She also said her mother gave her birthday gifts, but respondent did not.

¶ 49    H.A. claimed she saw respondent hit her mother and call her mean names. She also saw respondent hit R.A. but did not remember a particular instance. According to H.A., she felt scared at respondent's house because he was always mean to her and R.A., and she did not want to go back. H.A. said she missed her mother but not respondent.

¶ 50    When questioned by respondent's attorney, H.A. said she did not remember the name of the school where she went to kindergarten and preschool. H.A. said her grandmother told

her she was going to have to go to the courthouse and talk to some people. However, she said no one told her why she needed to answer questions at the courthouse. H.A. said her grandmother talked to her about what kinds of questions she might be asked. H.A. did not remember what her grandmother said, but H.A. testified no one told her what to say.

¶ 51　　　According to H.A., she, R.A., and her mother had lived with respondent, who was her father, "[a] long time ago." At present, she was living with her grandparents, and they did not talk about respondent. Before her mother died, she and R.A. lived with their mother. However, she still saw respondent every day after school.

¶ 52　　　H.A. remembered playing in a pool in respondent's yard and going on walks with R.A., respondent, and her mother. She did not remember how long she would be at respondent's house after school but stayed up until her mother picked her up. She did not remember staying overnight at respondent's after she, R.A., and her mother moved out of respondent's house.

¶ 53　　　According to her testimony, H.A. missed her mother and sometimes wore a locket that contained some of her mother's ashes. She did not remember her mother drinking beer or getting sick. However, she did remember her mother saying mean things to respondent and calling him bad names. She did not remember what her mother would say. When her mother was living with respondent, H.A. called respondent "dad."

¶ 54　　　　　　　　　7. *Testimony of Krystal W.*

¶ 55　　　Krystal W. testified she was married to Mohammed, had known respondent since 2003, frequently saw respondent when she babysat for him and Shannon, and had known H.A. and R.A. since they were very young. The girls had lived with her and Mohammed for two to three months around 2019, after DCFS removed the children from respondent and Shannon's home. She said respondent was allowed to visit the children unsupervised. However, she also said she never

received any paperwork from DCFS about the children. Krystal said respondent supplied clothes, diapers, wipes, food, and milk to Krystal while the children were living at her house and visited the children every few days. She testified she observed respondent playing, feeding, and comforting the children. Krystal claimed H.A. and R.A. were happy and excited to see respondent. According to Krystal, Shannon only visited the children once or twice. Krystal described Shannon as being drunk or depressed.

¶ 56 While Krystal was aware respondent drank alcohol, she had not seen him intoxicated. In addition, she had never seen respondent hit the children or seen injuries on the children. Further, she never saw him belittle the children or act in an uncaring manner toward them. She also never observed anything to make her believe the children were in either physical or emotional danger with respondent. Instead, respondent appeared to be a loving father who provided for the children in every way they needed. Neither H.A. nor R.A. ever seemed afraid of respondent. However, she acknowledged not seeing respondent or the children much after the girls went back to respondent and Shannon. Krystal said her own children never seemed afraid of respondent.

¶ 57 According to Krystal, she saw Shannon intoxicated many times, saw her yell, and saw her with an attitude toward respondent and the children. However, she never saw Shannon be physically violent. Krystal said she loved and cared about H.A. and R.A. and would not have testified on respondent's behalf if she believed he was not a good father.

¶ 58 8. *Testimony of Mohammed*

¶ 59 Mohammed testified Krystal was his wife. He had known respondent since 1989, but they were not related. Mohammed hired respondent to work for him in October 2022. Respondent worked for him until March 2023 on an as-needed basis. H.A. and R.A. lived with

him and his wife for around two months in 2019. During this time, he was in personal contact with DCFS. Respondent would come visit the girls almost every day. Mohammed saw respondent and the girls interact and saw nothing that concerned him. Respondent did not yell at, hit, or call the girls bad names. When respondent was at Mohammed's house, the girls wanted to be with him. Respondent would stay at the house as long as he could. The girls never appeared afraid of respondent. Mohammed testified he had never seen anything that caused him to be concerned that H.A. would not be physically or emotionally safe with respondent.

¶ 60       Mohammed said he had known Shannon since 2014. He frequently observed her in a drunken state, and she was often "out of control." He indicated he cared about H.A. and R.A. and would not be testifying on respondent's behalf if he did not believe he was a good father. However, he acknowledged he had only seen the girls a couple of times after 2019 and had no contact with them after Shannon and the girls moved out of respondent's house in August 2021.

¶ 61                              9. *Testimony of Respondent*

¶ 62       Respondent testified he started dating Shannon in the summer of 2015, when R.A. was six or seven months old. Shannon and R.A. moved into his house after living in Shannon's car. Respondent stated he was H.A.'s father. H.A. was born in October 2017. Shannon and the girls lived with him until August 2021. Shannon died one and a half years later. When Shannon and the girls lived with him, they put up a Christmas tree each year. He did throw away an artificial Christmas tree one year because it was old and falling apart but told Shannon they would buy a new tree. Instead, Shannon made a tree out of branches from the yard. According to respondent, they celebrated Christmas and put up decorations every year, and he bought presents for the children. They also celebrated Thanksgiving, Easter, Ramadan, and the girls' birthdays.

¶ 63       When Shannon and the girls were living with him, he had a small swimming pool

in the yard, a swing set, and a sandbox. The girls swam and played in the yard. Respondent stated he taught the girls to ride bikes, which they rode on a trail behind his house. When the girls were in the pool, respondent said he either got in the pool with them or stayed outside where he could supervise. Respondent said R.A. had her own bed and bedroom in the house.

¶ 64        According to respondent, Shannon had an alcohol problem when she lived with him. On multiple occasions, he had to call an ambulance for her because of what he described as seizures. Respondent said she would sometimes stumble and fall when she was drinking. On occasion, she got physical with him when she was drinking. One time, she stabbed him in the stomach, but he never called the police. Respondent said he and Shannon did not argue when she was sober.

¶ 65        After Shannon moved out of his house, respondent still saw the girls every day after school. Shannon did not pick the girls up until late at night. Respondent said he and Shannon got along after she moved out of his house and the four of them spent time together. Respondent said he cooked for the girls when they were at his house after school.

¶ 66        Respondent said he was not immediately notified of Shannon's death. When he learned of her death, he and Mohammed went to the police station to find the girls. The police said the girls were with their maternal grandmother. Respondent said his calls to Shannon's family were later blocked, and the maternal grandparents (petitioners) obtained a trespass notice keeping him from going to their home. Respondent said he tried to communicate with Shannon's family for two months after Shannon's death but stopped trying because he began going through the court system.

¶ 67        Respondent testified he was working full-time at Stoughton Trailer. Before Stoughton Trailer, he worked at Gold Star Express. According to respondent, he was able to

financially support both himself and H.A. Respondent told the trial court he had a well at his house, always had water, had an operable furnace, kept the temperature at 71 degrees Fahrenheit, and had blankets and beds. As for H.A.'s dental issues, respondent had believed Shannon was going to take H.A. to the dentist.

¶ 68 Respondent testified he was a permanent resident of the United States but not a United States citizen. He denied ever hitting either H.A. or R.A., calling either of them bad names, or being cruel or demeaning toward either of the girls. He stated he loved H.A. and wanted to parent her. He also denied hitting Shannon.

¶ 69 Respondent claimed he gave Shannon $3,000 in child support in 2022 but lacked any kind of receipt. He later acknowledged he did not give Shannon any child support in 2022. In the first two months of 2023, he said he gave Shannon what money he could afford. According to respondent, "Sometimes I give her 60, sometimes I give her 100, sometimes I give her 120, sometimes 200, whatever I can afford." He did not remember how much money he gave Shannon in 2021. In 2020, he said he gave Shannon money occasionally when he worked. However, he also acknowledged he did not make enough money to file a tax return that year. When asked how he could give money to Shannon in 2020 when he was also sending her text messages begging for $20, beer, and cigarettes, respondent said he did not remember sending those text messages. Respondent claimed he never went to court to set up child support payments for H.A. because he and Shannon had an agreement that he would help her.

¶ 70 Respondent claimed one of his prior attorneys told him not to ask for report cards for the children or to go to the school to see how the girls were doing. According to respondent, he tried to send the girls letters, pictures, supplies, and gifts, but the box he sent with these items was not delivered and was returned to him. As for him not giving petitioners any child support

money, he said no one had asked him for support money. He said he would have helped with anything the girls needed if petitioners would have asked. He said he wanted access to H.A., but petitioners blocked him.

¶ 71    According to respondent, petitioners wanted to keep him away from his children when they obtained the trespass notice. When asked why he thought he had been blocked by petitioners from sending messages and making telephone calls to them, respondent responded, "Because you try and send Messenger texts, don't go through. This is versus now. I try call their number they give me, it don't go through, it's blocked." Respondent also said he would have provided the petitioners with child support for the girls if they had gotten a court order for child support.

¶ 72    10. *Testimony of Bus Driver and Neighbors*

¶ 73    The children's bus driver and respondent's neighbors also testified. Gerald Schneiderman testified he was familiar with respondent because he had driven H.A. and R.A. to his house after school. He testified H.A. was always excited to see respondent. He and respondent usually exchanged pleasantries when the children left the bus, but he never interacted with respondent away from the bus stop. He had very limited interactions with the girls away from the bus. He said neither H.A. nor R.A. seemed afraid of respondent, and he observed nothing to make him believe respondent might be endangering the children. However, he acknowledged he was never inside respondent's home.

¶ 74    Drake Gross testified he had been respondent's neighbor for 10 years and could see into respondent's backyard from his own yard. He was familiar with the girls and their mother. He observed respondent taking care of the girls, who seemed like happy children. He did not recall ever seeing respondent engage in any concerning behavior with the children. Gross did not really

engage Shannon in conversation but heard her yelling about six times. He also saw her when she appeared to be intoxicated. After Shannon and respondent separated, he still frequently saw the girls at respondent's home. Gross said respondent seemed like a good father based on his observation of him and the girls outdoors. He recalled seeing the police at the house approximately three times.

¶ 75        Jennifer Hanson testified she lived across the street from respondent and was familiar with him and the girls. H.A. and R.A. came to her house and played with her grandchildren. Her grandchildren also sometimes went to respondent's home. She would see respondent outside with the children, never heard him say anything inappropriate, and never saw anything concerning, other than respondent and Shannon yelling. She never saw any physical fights between respondent and Shannon but did see the aftermath of the fights. Hanson did not see Shannon outside the house much unless they were going somewhere and stopped to talk to her. On one occasion, she watched the girls for a couple of days after an incident at respondent's home when respondent was arrested. After Shannon and respondent separated, Hanson still saw the children at respondent's house almost every day.

¶ 76        Hanson did not see respondent provide the children with any food other than popsicles but had no concerns the girls were not getting enough food. Further, she never thought the girls were afraid of respondent, and they appeared to enjoy spending time with him. She never saw respondent physically strike either girl, call them names, or do anything else to make her concerned about the girls' physical, mental, and emotional health. Jennifer acknowledged she did not know what went on inside respondent's home.

¶ 77                    11. *Testimony of Dr. Joseph L. Zakarija*

¶ 78        Dr. Joseph L. Zakarija, an expert in pediatric dentistry, testified he examined H.A.

on April 24, 2023. He testified H.A. had a "deep, deep, cavity" on one of her teeth. He had to remove the nerve tissue from that tooth, cleanse it, and place a crown over it. Another tooth had decay and a cavity and was restored with a filling. One tooth had to be extracted. Three other teeth had deep decay, requiring restoration with a pulpotomy and additional treatment. The doctor testified the conditions he corrected would have caused H.A. pain and discomfort. According to the doctor, the issues with her teeth would have been detected earlier if she had been seen on a regular basis.

¶ 79                                    B. Findings of Parental Unfitness

¶ 80            On November 15, 2024, the trial court found respondent was unfit. The court noted respondent and Shannon's tumultuous relationship, Shannon's substance abuse issues, and multiple instances of domestic violence against Shannon by respondent, which were documented by the testimony of H.A. and R.A. and a sentence in Stephenson County. According to the court's written order:

> "Ultimately, given the unavailability of the mother, and the lack of candor by the father at times in his testimony, the Court relied heavily on a determination of the minor and the minor's sister's credibility, which will be explored more in this opinion. There were other witnesses, but they largely provided a brief perception of an outside view of the home, including deputies who were in the home for brief periods of time, grandparents, a bus driver, neighbors, and a husband and wife who were friends of the father. The Court also heard the testimony of a dentist who saw [H.A.] after the death of her mother."

The court found petitioners failed to establish respondent had done the following: (1) abandoned H.A.; (2) failed to maintain a reasonable degree of interest, concern, or responsibility for H.A.'s

welfare; (3) inflicted or exposed H.A. to extreme and repeated cruelty; (4) failed to protect H.A. from conditions in her environment injurious to her welfare; (5) suffered from habitual drunkenness or addiction to drugs; or (6) repeatedly or continuously failed, although physically and financially able, to provide H.A. with adequate food, clothing, or shelter.

¶ 81        However, the trial court did find petitioners established by clear and convincing evidence respondent was unfit due to (1) his repeated or continuous substantial neglect of H.A. and (2) his other neglect of H.A. or misconduct toward her. In addressing respondent's continuous or repeated substantial neglect, the court noted H.A. and R.A. both testified respondent neither had food for them nor cooked for them. R.A. testified she was sad and hungry at respondent's house, that it was " 'not nice,' " and that she was afraid of respondent. H.A. also expressed sadness and anger about how she was treated by respondent. The court noted its contemporaneous impression of the girls was that they were genuinely afraid of respondent based on his history of causing physical harm to their mother and themselves. While the court noted respondent denied ever hitting Shannon or the girls, the court did not find him credible on that point. The court noted H.A. said she was scared at respondent's home and neither she nor R.A. ever wanted to go back there.

¶ 82        The trial court also noted the lack of food, water, and support in respondent's home for the girls. According to the court, after respondent and Shannon separated, R.A. and H.A. continued to go to respondent's home after school because Shannon was working. However, according to the girls, respondent provided them a place to stay but little else. He did not provide them with food and the home was cold. The court also noted Dr. Zakarija's testimony on H.A.'s significant dental issues.

¶ 83        The trial court found H.A. and R.A. competent to testify and credible. The court stated it found the girls understood the importance of telling the truth while testifying. Further,

their emotions were appropriate and consistent with the nature of their testimony. While the court recognized the girls were of an age where they could be influenced by people in their lives, the girls denied talking in any significant amount about respondent with other people, and the court did not believe they had been coached.

¶ 84        On the contrary, the trial court did not find respondent was a credible witness. The court noted he had very specific memories if those memories benefited him but no recollection of information unfavorable to his position. According to the court, respondent's denials of committing acts of physical violence toward women was not believable when compared to the evidence presented. The court noted its credibility determinations were important because respondent, H.A., and R.A. were the only witnesses as to what took place inside respondent's home.

¶ 85        The trial court found respondent's actions caused the girls physical harm on multiple occasions and fell outside the scope of corporal punishment. Respondent's actions left visible injuries to both of the girls. In addition, respondent exposed the girls to multiple instances of domestic violence in his home. The court also found respondent failed to provide appropriate resources to the girls. Further, H.A.'s dental deterioration had occurred over a period of time. According to the court, "Whether collectively or individually, [respondent's] actions constituted substantial neglect, and the Court finds they were continuous or repeated."

¶ 86        In finding respondent unfit for his other neglect of, or misconduct toward H.A., the trial court recognized this ground had received limited appellate review. Referring back to its earlier analysis, the court noted "the physical abuse, the lack of food and water, and the lack of dental care for the minor fall under the umbrella of other neglect or misconduct towards the child."

¶ 87                        C. Best-Interests Determination

¶ 88 Because respondent does not challenge the trial court's best-interests determination, we will only provide a brief summary of the second stage of the proceedings. On February 3, 2025, H.A.'s guardian *ad litem* (GAL) recommended respondent's parental rights be terminated. According to the GAL, "the abuse and/or neglect of [H.A.], and her mother, by [respondent] has severed the relationship between him and [H.A.] and that continuing that relationship would rob [H.A.] of her lifelong companion and best friend/sister, [R.A.]." The GAL indicated his best-interests recommendation relied heavily on (1) H.A.'s physical safety and welfare, including food, shelter, health, and clothing, and (2) her need for permanence, including her need for stability and continuity of relationships with parental figures, siblings, and other relatives. According to the GAL, no evidence substantiated that H.A. had any feelings of love toward respondent or felt safe with him. Instead, the opposite was true.

¶ 89 On March 11, 2025, the trial court terminated respondent's parental rights after finding petitioners established termination of his parental rights was in H.A.'s best interests.

¶ 90 This appeal followed.

¶ 91 II. ANALYSIS

¶ 92 This adoption case involves the involuntary termination of respondent's parental rights. Our supreme court has explained:

"Generally, the adoption of a minor child requires the consent of both parents. See 750 ILCS 50/8(b) (West 2000). However, if the trial court finds a parent to be an unfit person, as defined in the [Act], by clear and convincing evidence, that parent's consent is not required. 750 ILCS 50/8(a)(1) (West 2000) (referring to grounds for unfitness enumerated at 750 ILCS 50/1(D) (West 2000)). The burden of presenting clear and convincing evidence of unfitness is on those

petitioning for adoption." *In re Adoption of L.T.M.*, 214 Ill. 2d 60, 67-68 (2005). On appeal, respondent argues petitioners did not present clear and convincing evidence he was unfit and the trial court erred in finding he was unfit. Respondent does not challenge the court's determination it was in H.A.'s best interests to terminate his parental rights.

¶ 93                          A. Standard of Review

¶ 94           In an involuntary adoption case, a trial court's determination a parent is unfit is given deference. *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002). We will not disturb the court's finding unless it is against the manifest weight of the evidence presented. *Id.* According to our supreme court:

> "Under a manifest weight of the evidence standard, we give deference to the trial court as the finder of fact because it is in the best position to observe the conduct and demeanor of the parties and the witnesses and has a degree of familiarity with the evidence that a reviewing court cannot possibly obtain. A reviewing court, therefore, must not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn." *Id.*

A court's finding of unfitness is against the manifest weight of the evidence if it is clearly apparent from the record that either the trial court should have reached the opposite determination or the court's conclusion was unreasonable, arbitrary, or not based on the evidence presented. *Id.* at 498.

¶ 95                          B. Findings of Unfitness

¶ 96           The trial court found respondent unfit based on his substantial neglect of H.A. that was continuous or repeated (750 ILCS 50/1(D)(d) (West 2024)) and his other neglect of, or misconduct toward, H.A. (*id.* § 50/1(D)(h)). Respondent argues the court's two findings of

unfitness are against the manifest weight of the evidence. In order to prevail in this appeal, respondent would have to establish both of the court's determinations were against the manifest weight of the evidence. See *D.F.*, 201 Ill. 2d at 506 ("[P]arental rights may be terminated upon proof, by clear and convincing evidence, of a single statutory ground for unfitness.").

¶ 97                                        1. *Credibility Determinations*

¶ 98          Both of the trial court's findings of unfitness were based on its determinations H.A. and R.A. provided credible testimony and respondent did not. Respondent argues the court erred in its credibility determinations and by placing so much weight on the girls' testimony. According to respondent, the circumstances of the girls' testimony do not support its reliability. We disagree.

¶ 99          Based on our reading of respondent's arguments, he suggests the girls' testimony should not be seen as reliable for various reasons. For example, respondent noted the girls had not made spontaneous statements to anyone about his conduct. However, respondent provides no authority supporting a proposition the lack of spontaneous statements by a victim somehow makes later trial testimony inherently unreliable. We see no merit in respondent's suggestion. The trial judge in this case ensured the girls understood the importance of telling the truth and understood the difference between the truth and a lie. Further, the judge was able to view the girls' testimony and determine their credibility.

¶ 100          Respondent also argued the children may have been coached or "manipulated into lying by other family members." According to respondent, petitioners had a motive to influence the children's testimony to influence the outcome of the case because they had already adopted R.A. and Shannon's three older children. However, the trial court considered this when weighing H.A.'s and R.A.'s testimony, specifically recognizing the testimony of young children can be influenced or coached by people in their lives. However, based on the court's observations, it

determined the children were not "generally coached."

¶ 101        Further, respondent challenged R.A.'s testimony because she said respondent did not have water because he could not afford it. Respondent asserts he has a well and does not have to pay for water. According to respondent's brief, "It is curious that a 9-year old would even know or be aware of the concept of a water bill in this circumstance unless she was hearing it from an adult." However, whether R.A. was wrong in believing respondent could not afford to pay for water does not affect the credibility of her assertion respondent did not have water for them to bathe. Regardless of whether respondent had a well, this does not establish he had running water or the ability to heat that water for showers and bathing. Moreover, respondent's testimony he had a well, coupled with R.A.'s statement they had to use a bucket to get water to bathe, could create a reasonable inference there was not running water in the home.

¶ 102        Respondent also challenges the girls' testimony that it was cold at his house and he did not have adequate beds and blankets, pointing to photographs showing blankets in the house. Respondent also argues the girls gave the impression it was cold in the house all the time, which does not make sense considering the climate in northern Illinois. However, the trial court was well aware of the climate in northern Illinois. Further, the girls may have focused on the house being cold because their last experience being at respondent's house was in the winter. Finally, the existence of blankets at the specific times captured by those photographs does not establish the girls were lying when they testified there were times when it was cold in the house and respondent did not have blankets for them to stay warm.

¶ 103        Continuing with his credibility argument, respondent points to the testimony of the bus driver and his neighbors that neither H.A. nor R.A. seemed to be afraid of respondent and generally appeared happy. The trial court did not ignore the testimony of these witnesses.

However, those witnesses were not aware of what went on inside respondent's home.

¶ 104　　　　Finally, according to respondent, if he was abusing or neglecting the children to the extent they said, the children would have told Shannon about it, and she would not have allowed the children to be around him. However, while Shannon's fitness as a parent was not at issue in this case, the trial court did not have to presume Shannon did not know what was going on when the children were at respondent's home. The evidence in this case established Shannon had her own challenges, including alcohol addiction and being the victim of domestic battery. Thus, based on the record before us, this court cannot conclude Shannon would not have allowed the children to be around respondent if she was aware of the girls' complaints.

¶ 105　　　　As noted above, the trial court was in a superior position to judge the credibility of the witnesses who testified before it than is this court. *D.F.*, 201 Ill. 2d at 498-99. Although this court did not have the benefit of observing the witnesses, it is clear to see how the court found H.A. and R.A. to be more credible than respondent based on the record. While it is possible another trier of fact might have viewed the evidence in this case differently, we will not second-guess the trial court's credibility determinations here, as the court's decision was not unreasonable or arbitrary.

¶ 106　　　　　　　　　　　2. *Text and Facebook Messenger Messages*

¶ 107　　　　Respondent also argues the trial court erred by admitting Facebook Messenger messages between Shannon and her mother and text messages purportedly between him and Shannon. While respondent recognizes the court admitted the Messenger messages for the limited purpose of showing Shannon and Lisa had an active relationship, which rebutted a sworn pleading filed by respondent, respondent argues they should not have been admitted because they were not relevant to his fitness, they were highly prejudicial, and Shannon was deceased. Respondent

correctly points out Shannon had issues of her own in this case. As for the text messages purportedly between respondent and Shannon which Lisa found on Shannon's phone after her death, respondent argues "[o]nly a selection of messages were provided, and in addition to the issue of accuracy, the issue of completeness was raised in [the] Trial Court."

¶ 108    As petitioners point out in their brief, respondent failed to cite any authority to support his argument the trial court erred in admitting either the Facebook Messenger messages or the text messages. As a result, pursuant to Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020), we agree respondent forfeited these arguments. However, regardless of forfeiture and even assuming, *arguendo*, the trial court erred in admitting this evidence, the mistake would not constitute reversible error. The erroneous admission of evidence is not reversible error unless a party has been prejudiced or the proceedings were materially affected. *Pister v. Matrix Service Industrial Contractors, Inc.*, 2013 IL App (4th) 120781, ¶ 56. In this case, the trial court explicitly stated it did not place significant weight on the messages and "relied almost exclusively on other evidence for [its] findings." Considering the record in this case, respondent was not prejudiced by the admission of the Facebook Messenger messages or text messages. The court primarily relied on the testimony of R.A. and H.A. because it found the girls' testimony credible and found respondent's testimony not credible.

¶ 109    3. *Substantial Neglect (Repeated or Continuous)*

¶ 110    Anticipating this court might not disturb the trial court's credibility determinations, respondent also argued petitioners did not present sufficient evidence to establish by clear and convincing evidence he substantially neglected H.A. on a repeated or continuous basis. According to respondent, the trial court's finding he was unfit based on substantial neglect was against the manifest weight of the evidence.

¶ 111        Section 1(D)(d) of the Act states a parent may be declared unfit upon proof he or she substantially neglected a child if the neglect was continuous or repeated. *D.F.*, 201 Ill. 2d at 495. Our supreme court has recognized the Act did not provide a definition for "substantial" or "neglect" but did define a "neglected child" as:

> " 'any child whose parent or other person responsible for the child's welfare withholds or denies nourishment or medically indicated treatment *** or otherwise does not provide the proper or necessary support, education as required by law, or medical or other remedial care recognized under State law as necessary for a child's well-being, or other care necessary for his or her well-being, including adequate food, clothing, and shelter; or who is abandoned by his or her parents or other person responsible for the child's welfare.' " *Id.* (quoting 750 ILCS 50/1(Q) (West 1998)).

Because the term "substantial neglect" is not defined by the Act, the term is given its ordinary meaning. *Id.* at 496. "Webster's defines 'substantial' as 'consisting of, relating to, sharing the nature of, or constituting substance' and as 'considerable in amount, value, or worth.' Webster's Third New International Dictionary 2280 (1986). Synonyms include 'consequential,' 'considerable,' 'material,' 'meaningful,' 'momentous,' 'significant,' and 'weighty.' " *Id.*

¶ 112        According to our supreme court, "the legislature intended for the trial court to determine whether neglect in a given case, proven by clear and convincing evidence [citation] and based on the totality of the circumstances, is substantial." *Id.* at 498. Our supreme court found there was no need to create a bright-line rule to differentiate neglect from substantial neglect. *Id.* The court explained:

> "Neglect may take many forms. The statutory definition of a neglected child

mentions, *inter alia*, lack of proper nourishment, denial of needed medical care, lack of education, failure to provide adequate clothing and shelter, and abandonment. 750 ILCS 50/1(Q) (West 1998). Section 1(D)(d) does not require that one single form of neglect be proven to be substantial. We agree with the trial court that substantial neglect may result from the cumulative effect of several forms of neglect. As this court observed many years ago, '[n]eglect *** is the failure to exercise the care that the circumstances justly demand. It embraces willful as well as unintentional disregard of duty. It is not a term of fixed and measured meaning. It takes its content always from specific circumstances, and its meaning varies as the context of surrounding circumstances changes.' " *Id.* at 499 (quoting *People ex rel. Wallace v. Labrenz*, 411 Ill. 618, 624 (1952)).

¶ 113 Although respondent claims the evidence in this case is insufficient to establish by clear and convincing evidence that he was unfit, he fails to address the trial court's reasoning or explain why the court could not have found him unfit considering the court's factual findings and credibility determinations. The court noted both H.A. and R.A. testified respondent neither had food for them nor cooked for them. In addition, the court found the girls were afraid of respondent because he had caused physical harm to both their mother and the girls themselves. The court did not find respondent credible when he denied ever hitting Shannon and/or the girls. The court also noted the lack of water in the home and the fact the temperature of the home was cold. Finally, the court noted Dr. Zakarija's testimony regarding H.A.'s significant dental deterioration.

¶ 114 The trial court essentially determined respondent had failed to provide H.A. with food, warmth, the ability to bathe, appropriate dental hygiene, and safety and security over a period of time. Respondent provided this court with no real argument why the evidence was not sufficient

for petitioners to meet their burden of presenting clear and convincing evidence respondent substantially neglected H.A. over an extended period of time.

¶ 115 As a result, pursuant to Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020), respondent forfeited any argument the trial court could not have found him unfit based on the evidence presented and its factual and credibility determinations in this case. Regardless of forfeiture, based on our supreme court's reasoning in *D.F.* and the deferential standard of review in this case, we could not say the trial court's determination respondent was unfit was against the manifest weight of the evidence.

¶ 116 C. Other Neglect Of, or Misconduct Toward, H.A.

¶ 117 "Because parental rights may be terminated upon proof, by clear and convincing evidence, of a single statutory ground for unfitness" (*D.F.*, 201 Ill. 2d at 506), we need not consider respondent's argument the trial court erred in finding him unfit based on "other neglect."

¶ 118 D. Undeveloped Assertion of Error

¶ 119 Respondent also claims he was not notified by the hospital, medical examiner, or any law enforcement officer about Shannon's death or H.A.'s whereabouts after Shannon's death, even though he was listed on H.A.'s birth certificate as her father. Respondent also complains the police were uninterested in returning H.A. to him, even though he was her father. He asserts no interim custody order was even entered after Shannon's death. According to respondent, H.A. should have been returned to his care after Shannon's death.

¶ 120 However, once again, based on respondent's brief, it is unclear why he believes this should affect the trial court's order finding him unfit. Respondent provides no real analysis as to why the court erred in proceeding in the manner it chose. As this court frequently points out, it is not a depository for an appellant to dump the burden of argument and research. *People v. Macias*,

2015 IL App (1st) 132039, ¶ 88. As a result, whatever point respondent was attempting to make, we find he forfeited it pursuant to Rule 341(h)(7).

¶ 121                                III. CONCLUSION

¶ 122        For the reasons stated, we affirm the trial court's judgment.

¶ 123        Affirmed.